**In re YARN PROCESSING PATENT VALIDITY LITIGATION (NO. II).**

**MDL No. 574.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Dec. 20, 1984.

James W. Crabtree, Charlotte, N.C., for plaintiff.

Charles B. Park, III, Bell, Seltzer, Park & Gibson, Charlotte, N.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

### . FINDINGS OF FACT

1. These fifteen actions for patent infringement were consolidated here for pretrial proceedings pursuant to 28 U.S.C. § 1407 by means of orders entered by the Judicial Panel on Multidistrict Litigation on December 2 and December 8, 1983, and January 16, 1984.

2. The plaintiff in all fifteen actions is Lex Tex Ltd., Inc. ("Lex Tex"), a patent holding company which was incorporated in Florida and which owns the patent in suit by reason of an assignment dated April 28, 1970, from a North Carolina corporation named Lex Tex Ltd.

3. All but two of these actions were commenced in the period May-July, 1983, the exceptions being the actions against defendants Barmag and Carisbrook, which were commenced in January, 1983, and November, 1983, respectively.

4. These actions are presently before the court on motions for summary judgment which have been filed by all defendants and which are predicated upon plaintiff's alleged failure to comply with 35 U.S.C. § 287 and upon laches or estoppel. The court has determined that the motions should be allowed as to all defendants as more particularly set forth below.

5. Lex Tex has not disputed or has presented no evidence which controverts the following facts:

A. The patent in suit in all thirteen actions is United States Patent No. 3,092,912 ("the '912 patent"), which is entitled "Method of Processing Stretch Yarns and Yarns Produced Thereby," and which issued on June 4, 1963, naming as inventors Nicholas

J. Stoddard and Warren A. Seem, both of whom are now deceased. The patent expired on June 4, 1980.

B. The '912 patent contains 25 method claims directed to processing certain textile yarns on double heater yarn texturing machines and 6 product claims directed to textured yarn alleged to result from this processing. In its complaints in these actions, Lex Tex asserts infringement of only "certain product claims" and no method claims.

C. Lex Tex's complaints allege that twelve of the defendants have infringed the foregoing product claims by making yarn on double heater machines, by selling yarn made on these machines, or by using yarn made on these machines to make textile fabrics. Lex Tex's complaint against the thirteenth defendant, Barmag, alleges that, by supplying double heater machinery to others, Barmag has "aided and abetted" infringement.

D. Lex Tex's complaints seek damages from each defendant for allegedly infringing acts which occurred during the period from May 31, 1977, to June 4, 1980. Lex Tex seeks no injunctive relief inasmuch as the '912 patent expired more than four years ago.

E. The '912 patent has been involved in previous litigation, specifically, two series of infringement actions filed in 1971–72 and 1977–78, respectively, and consolidated in the Southern District of Florida as a part of MDL 82 (a multidistrict litigation which involved other parties and additional patents). *See In Re Yarn Processing Patent Validity Litigation*, 541 F.2d 1127 (5th Cir.1976), 472 F.Supp. 170 (S.D.Fla.1979).

F. With three exceptions, none of the defendants in MDL 574 were parties to any of the proceedings which were consolidated as MDL 82. Standard-Coosa-Thatcher was named as a defendant in a breach of contract suit which was commenced by Lex Tex in 1972, but dismissed for lack of jurisdiction in 1973. Barmag was sued by Lex Tex in 1978 for alleged infringement of United States Patent No. 3,077,724, another patent owned by Lex Tex which is not asserted in MDL 574. Butte was sued for infringement of the '912 patent, but the action was voluntarily dismissed by Lex Tex on May 18, 1971, and was never reinstated.

## ABSENCE OF MARKING

G. Although Lex Tex has never made or sold any yarn, it did over the 1968–1976 period enter into more than a dozen agreements with several textile manufacturers authorizing those manufacturers to make yarns allegedly covered by the claims of the '912 patent and to use and sell these yarns.

H. Some of the agreements by which Lex Tex authorized textile manufacturers to make yarn purportedly covered by the claims of the '912 patent were express "licenses"; whereas, in other agreements Lex Tex covenanted not to sue textile manufacturers and their customers for infringement of the '912 patent with respect to yarn made on double heater machines or the sale or use of these yarns.

I. None of the agreements by which Lex Tex authorized textile manufacturers to make, sell, or use yarns made on double heater machines contains any provision requiring any such textile manufacturer to mark the yarn or any package containing the yarn with the number of the '912 patent, the word "patent" or the abbreviation "Pat."

J. Lex Tex admitted the authenticity of all of the agreements upon which defendants rely to demonstrate Lex Tex's having authorized textile manufacturers to make, use or sell yarns made on double heater machines.

K. Pursuant to an agreement among Celanese and Fiber Industries and Lex Tex whereby Lex Tex covenanted that it would not sue Celanese, Fiber Industries, their affiliates or their customers for infringement of the '912 patent with respect to yarns made on double heater machines, Celanese and Fiber Industries made substantial quantities of yarn on double heater machines and sold this yarn without mark-

ing it or its packages with the number of the '912 patent, the word "patented" or the abbreviation, "pat." (*See* Affidavit of Herbert M. Adrian, Jr., May 7, 1984, and exhibit thereto appended to Butte motion.)

L. Pursuant to an agreement between American Enka (Akzona) and Lex Tex whereby Lex Tex covenanted that it would not sue Akzona or its customers for infringement of the '912 patent with respect to yarns made on double heater machines, Akzona made hundreds of thousands of pounds of yarn on double heater machines and sold this yarn without marking it or its packages with the number of the '912 patent, the word "patented" or the abbreviation, "Pat." (*See* Deposition of Francis Young, February 6, 1984, transcript and exhibits thereto appended to Butte motion.)

M. Lex Tex construes the claims presently in issue as being directed to yarns made on double heater machines. For example, Lex Tex's complaints in these actions accuse defendants of infringing these claims by "making yarn on double heater machines." At the July 24, 1984, hearing conducted in this matter, Lex Tex's counsel represented that Lex Tex "knows" that one defendant (Butte) has infringed the product claims of the '912 patent simply because that defendant had made yarn on double heater machines. And in MDL 82, Robert F. Conrad, a patent lawyer who owns a significant amount of Lex Tex's stock, testified that double heater machines "can produce nothing else except the yarn that is made by or covered by the Lex Tex patents." (Trial testimony of Robert F. Conrad, September 10, 1982, MDL 82, 4 Tr. 310.) Thus, Lex Tex's argument that defendants have not adequately proved that the double heater yarns made and sold by Fiber Industries and Akzona were covered by the product claims of the '912 patent, is erroneous.

N. Aside from the foregoing evidence regarding manufacture, use and sale, pursuant to Lex Tex's authorization, of unmarked yarns made on double heater machines, Lex Tex admits that it has collected royalties from Woonsocket and Textured Fibers pursuant to licenses providing for running production royalties.

O. At the July 24, 1984, hearing on defendants' motions for summary judgment, counsel for Lex Tex conceded that Lex Tex knew of no evidence that any yarns made on double heater machines pursuant to any authorization granted by Lex Tex was ever marked (or the packages containing such yarns ever marked) with the number of the '912 patent.

## ABSENCE OF ACTUAL NOTICE

P. Lex Tex placed a series of advertisements entitled "Notice" (the last of which was dated March 15, 1977) in various issues of the *Daily News Record,* a trade publication (copies of these advertisements are appended to Spray's Motion for Summary Judgment). These advertisements refer to three different patents; they do not specify any product claims of the '912 patent; they do not specify any allegedly infringing product, and they do not identify any specific texturer alleged to infringe.

Q. Defendants have shown that they have no records of having seen any of the advertisements placed by Lex Tex in the *Daily News Record* and that their personnel have no recollection of ever having seen any of these advertisements. Lex Tex has produced no evidence whatsoever to the contrary.

### *Avondale Mills*

R. Defendant Avondale Mills has not made any yarn on double heater machines since at least July, 1978, and no longer owns or has access to these machines or the facility where they were located. It has only a few documents relating to its double heater yarn production and it has no samples of its double heater yarns. Only a few of Avondale's texturing employees from the July, 1978, period remain with the company. Avondale has no record of ever having received any communication from Lex Tex prior to February, 1983. It has no record and its officers have no recollection of having seen any Lex Tex "notice" in the *Daily News Record.*

### Carisbrook Industries

S. From time to time during the period from May 31, 1977, to June 4, 1980, defendant Carisbrook Industries textured yarn on some of its ARCT double heater machines, but these machines are now inoperative and all yarns textured by Carisbrook on double heater machines have been disposed of. Carisbrook has no record of ever having received any communication from Lex Tex. It has no record and its officers have no recollection of ever having seen any Lex Tex advertisement or "notice" in any trade publication.

### Comtex Corporation

T. From time to time during the period from May 31, 1977, to June 4, 1980, defendant Comtex Corporation textured yarn on one or more of four Barmag double heater machines it owns; but Comtex no longer has any samples of this yarn. Comtex has no record and its officers have no recollection of ever having seen any Lex Tex "notice" in the *Daily News Record.* Comtex has no record of ever having received any communication from Lex Tex other than a letter dated May 7, 1980, from one of Lex Tex's lawyers. This letter refers to three patents (including the '912 patent), "assumes" that the operation by Comtex of Barmag double heater machines "infringes the patents" and indicates an intent to seek damages if certain other matters turn out to be favorable to Lex Tex.

### Dan River Inc.

U. From time to time during the period from May 31, 1977, to June 4, 1980, defendant Dan River Inc. textured yarn on some of its double heater machines; but Dan River has subsequently disposed of these machines and the facility in which they were located, as well as all samples of double heater yarn and most records relating to this yarn. All of the personnel previously involved in Dan River's double heater texturing operations have left the company. Dan River has no record of ever having received any communication from Lex Tex prior to February, 1983. It has no

record and its officers have no recollection that anyone ever saw any Lex Tex "notice" in the *Daily News Record.*

### Dillon Yarn Corporation

V. Dillon Yarn Corporation was first organized on August 6, 1979, and commenced business operations thereafter. From November, 1979, through June 4, 1980, Dillon processed synthetic yarn on double heater machines.

W. Prior to June 4, 1980, Dillon never received any notice that the yarn it processed and sold was considered to be an infringement of U.S. Letters Patent No. 3,091,912. Dillon did not receive notice until it was sued in 1983.

X. Because Dillon Yarn Corporation did not exist before the latter half of 1979, the advertisements placed by Lex Tex in the *Daily News Record* in 1977 and earlier could not have served as notice to Dillon.

### Hemmerich Industries

Y. Prior to May 31, 1977, defendant Hemmerich Industries terminated its yarn texturing operations and disposed of its double heater machines, its double heater yarn samples and related documents. During the period from May 31, 1977, to June 4, 1980, Hemmerich did not operate any double heater machines and did not produce any double heater yarns. Although Hemmerich did purchase textured yarns from outside sources, Hemmerich does not know the machines or conditions used to produce these yarns. Hemmerich has no record of ever having received any communication from Lex Tex other than a letter dated May 7, 1980, from one of Lex Tex's lawyers. This letter refers to three different patents (including the '912 patent), "assumes" that the operation by Hemmerich of ARCT double heater machines "infringes the patents," and expresses an intent to seek damages if certain other matters turn out favorably for Lex Tex.

### Leslie Yarns

Z. From time to time during the period from 1979 to June 4, 1980, defendant Leslie

Yarns textured yarn on double heater machines it had acquired on a secondhand basis in late 1978. However, Leslie textured no yarn of any kind prior to 1979. Leslie has no record of ever having received any communication from Lex Tex prior to March, 1983. Leslie has no record and its officers have no recollection of ever having seen any "notice" or advertisement placed by Lex Tex in the *Daily News Record.*

### Mills Yarn, Inc.

AA. From time to time during the period from May 31, 1977, to June 4, 1980, defendant Mills Yarn textured yarn on its double heater machines; but Mills no longer has any samples of that yarn. Mills has no record and its officers have no recollection of ever having seen or received any advertisement, notice or communication from Lex Tex prior to February, 1983.

### O'Mara Texturing Corporation and O'Mara, Inc.

AB. From time to time during the period from May 31, 1977, to June 4, 1980, defendant O'Mara Texturing Corporation textured yarns on Barmag double heater machines, which O'Mara acquired on a secondhand basis. However, O'Mara has disposed of these machines, all samples of the yarn made on these machines and related documents. Defendants O'Mara Texturing and O'Mara, Inc. have no record of ever having received any communication from Lex Tex prior to March, 1983. They have no record and their officers have no recollection of ever having seen any Lex Tex "notice" in the *Daily News Record.*

### Spectrum Fibers, Inc.

AC. Defendant Spectrum Fibers has not made any yarn on double heater machines. From time to time during the period from May 31, 1977, to June 4, 1980, Spectrum did purchase textured yarn from outside sources for use in its yarn dyeing operations; but Spectrum does not know the conditions under which these yarns were produced, and Spectrum no longer

has any samples of these yarns. Spectrum has no record of ever having received any communication from Lex Tex prior to February, 1983. It has no record and its officers have no recollection of ever having seen any Lex Tex "notice" in the *Daily News Record.*

### Spray Textured Yarns Corporation

AD. From time to time during the period from May 31, 1977, to June 4, 1980, defendant Spray Textured Yarns textured yarns on double heater machines; but Spray has since terminated its texturing operations and disposed of its double heater machines, its yarn samples, and some of its records. Spray has no record of ever having received any communication from Lex Tex prior to February, 1980. Spray has no record and its officers have no recollection of ever having seen any Lex Tex "notice" in the *Daily News Record.* While Lex Tex has asserted that it sent Spray a letter dated May 7, 1980, Spray has not been able to find this alleged letter and Lex Tex has failed to produce a copy of it.

### Ti-Caro, Inc.

AE. Defendant Ti-Caro, Inc. has never owned or operated any double heater machines and has never textured any yarn on any double heater machine. From time to time during the period from May 31, 1977, to June 4, 1980, Ti-Caro did purchase textured yarns from outside sources for use in its fabric-making operations. Ti-Caro presently understands that at least some of those third parties were at the time licensed by Lex Tex to make yarn on double heater machines. Ti-Caro has no record of ever having received any communication from Lex Tex prior to February, 1983. Ti-Caro has no record and its officers have no recollection of ever having seen any Lex Tex "notice" in the *Daily News Record.*

### Butte Knitting Mills A Division of Jonathan Logan, Inc.

AF. From time to time during the period from May 31, 1977, to June 4, 1980, defendant Butte Knitting Mills textured

yarn on ARCT double heater machines. However, shortly after June, 1980, Butte terminated its double heater texturing operation and disposed of its machines, its yarn samples, and nearly all relevant records. The few records still in existence indicate that no double heater yarns were produced after March, 1980.

AG. On January 21, 1971, Lex Tex brought an action against Butte in the Southern District of Florida for infringement of the '912 patent, accusing Butte of making fabrics from yarn made on double heater machines and selling such fabric. This action was voluntarily dismissed by Lex Tex on May 18, 1971, and was never reinstituted.

AH. Butte has no record of ever having received any communication from Lex Tex following dismissal of the 1971 infringement suit other than a letter dated May 7, 1980, from one of Lex Tex's lawyers. This letter referred to three patents (including the '912 patent), assumed that Butte was operating its ARCT machines, further assumed that the operation by Butte of ARCT double heater machines would "infringe the patents," and expressed an intent to seek damages if certain other matters turn out favorably for Lex Tex.

AI. Butte has no record and its officers have no recollection of ever having seen any Lex Tex "notice" in the *Daily News Record.*

### Standard-Coosa-Thatcher Company

AJ. From time to time during the period from May 31, 1977, to June 4, 1980, defendant Standard-Coosa-Thatcher textured yarn on at least some of its double heater machines.

AK. Two of Standard-Coosa-Thatcher's Leesona double heater machines were the subject of a Lex Tex license agreement executed on December 9, 1970, pursuant to which Lex Tex licensed Standard-Coosa-Thatcher under the '912 patent with respect to yarns produced on the two Leesona double heater machines. In return, Standard-Coosa-Thatcher agreed to pay Lex Tex a royalty. This license contains no

provision or requirement for Standard-Coosa-Thatcher to mark yarns made on those machines (or the packages containing those yarns) with the number of the '912 patent, the word "patented" or the abbreviation, "pat."

AL. On July 5, 1972, Lex Tex brought an action against Standard-Coosa-Thatcher in the Southern District of Florida for breach of the December 9, 1970, license agreement by reason of royalties Lex Tex alleged to be due but unpaid. This action was dismissed for lack of jurisdiction on March 15, 1973, pursuant to a motion filed by Standard-Coosa-Thatcher on September 15, 1972. Lex Tex never reinstituted this contract action and never filed any other action against Standard-Coosa-Thatcher until Lex Tex filed the present complaint for alleged infringement against Standard-Coosa-Thatcher in 1983.

AM. Standard-Coosa-Thatcher has no record and its officers have no recollection of ever having seen any Lex Tex "notice" in the *Daily News Record.* With two exceptions, Standard-Coosa-Thatcher has no record of ever having received any letter from Lex Tex prior to 1983. The two exceptions are a letter from Robert Conrad dated May 31, 1977, which indicated that the '912 patent had been held misused and that no royalties need therefore be paid, and a letter dated May 7, 1980, from one of Lex Tex's attorneys. The May 7, 1980, letter refers to three patents (including the '912 patent), "assumes" that operation, if any, by Standard-Coosa-Thatcher of its one Barmag machine "infringes the patents" and indicates an intent to seek damages if certain other matters turn out favorably for Lex Tex.

### Barmag Barmer Maschinenfabrik AG

AN. Defendant Barmag Barmer Maschinenfabrik AG ("Barmag") is a West German manufacturer of double heater machines. It sells those machines to certain textile manufacturers (called "throwsters") throughout the world, including throwsters in the United States. Barmag is not a

throwing concern; it has never commercially made, sold or used any yarn products; and it has never operated any double heater machines on a commercial basis.

AO. Lex Tex accuses Barmag of "aiding and abetting" infringement of the yarn product claims of the '912 patent by making, soliciting the purchase of, and selling double heater machines in this country. At no time prior to the commencement of this action in January, 1983, did Lex Tex ever give Barmag "notice" of an intent to sue Barmag for aiding and abetting the infringement of the yarn product claims of the '912 patent.

AP. In February, 1969, Lex Tex entered into an agreement with Barmag wherein Barmag agreed: (a) further to develop, promote and sell double heater machines to American textile companies; and (b) to inform its customers of the Lex Tex patents and licensing program, and wherein Lex Tex agreed: (a) to license Barmag's customers under the '912 patent; (b) to release Barmag from any liability for infringement of Patents Nos. 3,077,724 and 3,091,912 for Barmag customers licensed by Lex Tex; and (c) to pay Barmag part of the royalties collected by Lex Tex from Barmag's customers.

AQ. After this agreement, Barmag further developed and promoted double heater machines and sold hundreds of these machines to customers in the United States. Additionally, Barmag informed those customers of the Lex Tex patents and licensing program.

AR. In late 1970, Lex Tex threatened to sue Barmag for infringement of the '912 patent, if Barmag continued to deliver machines to customers whom Lex Tex did not license; however, this threat did not specify any product claims of the '912 patent. Barmag was not sued on the '912 patent until some thirteen years after the 1970 threat was made.

AS. In 1977, Lex Tex informed Barmag that it was considering suing machinery manufacturers on another Lex Tex patent, Patent No. 3,077,724; however, no mention was made at that time of any intent to sue

any machinery manufacturer on the '912 patent.

AT. In 1978, Lex Tex sued Barmag for infringement of United States Patent No. 3,077,724. Because Lex Tex's complaint in the 1978 action mentioned three different Lex Tex patents—Nos. 3,077,724; 3,091,-912; and 3,472,011—Barmag moved for a more definite statement. In response to Barmag's motion, Lex Tex amended its complaint to make clear that it was asserting only its Patent No. 3,077,724.

AU. In 1979, Lex Tex successfully moved to amend its 1978 complaint against Barmag to add a claim for infringement of another patent, No. 3,472,011. In its motion to amend, Lex Tex stated that the purpose of its amendment was to "resolve in one action all infringements of Lex Tex patents" by Barmag, but the motion made no mention of the '912 patent.

AV. Until January, 1978, Lex Tex never sued any manufacturer of double heater machinery for infringement of any patent. Until January, 1983, when the present action was brought against Barmag, Lex Tex never sued any machinery manufacturer on any claim under the '912 patent. Barmag is the only machinery manufacturer which Lex Tex has ever sued on any claim with respect to the '912 patent.

AW. Under the foregoing circumstances, Barmag during the course of MDL 82, was not a party in either the discovery as to the '912 patent or in any reissue proceedings in the Patent and Trademark Office regarding that patent.

AX. Lex Tex delayed in enforcing the patent for a period of twelve years as to Butte, ten years as to Standard-Coosa-Thatcher and twelve years as to Barmag.

AY. Both of the inventors named in the '912 patent died during the course of Lex Tex's delay in enforcing the '912 patent against Butte, Standard-Coosa-Thatcher and Barmag.

AZ. The sale of double heater machines has benefited Lex Tex through generation of royalties which Lex Tex has collected.

**168**

6. Despite Lex Tex's arguments to the contrary, there is also no genuine issue as to the following facts:

A. Lex Tex has not overcome the presumptions of unreasonableness and material prejudice resulting from its delay; and the evidence offered by Lex Tex does not excuse it.

B. Butte, Standard-Coosa-Thatcher and Barmag have suffered actual prejudice as a result of Lex Tex's delay in suing them, including the death of both inventors named in the '912 patent, the loss of relevant documents, yarn samples and other evidence, loss of the opportunity to participate in common discovery in MDL 82 (thereby reducing costs), loss of the opportunity to participate in the reissue proceeding conducted in the Patent and Trademark Office regarding the '912 patent, loss of any opportunity to mitigate damages (in the case of Butte and Standard-Coosa-Thatcher), for example, by purchasing yarns from Lex Tex's licensees (in the case of Butte and Standard-Coosa-Thatcher) or by obtaining indemnification from its customers (in the case of Barmag). Additionally, Barmag would be prejudiced if it were made to pay damages because it significantly expanded its double heater machinery business in the United States at the urging of Lex Tex.

C. At the oral hearing in this matter on July 24, 1984, Lex Tex contended that Mr. Robert Levinson, now an officer of Dillon Yarn Corporation, was deposed during the MDL 82 litigation involving the '912 patent, and therefore had prior knowledge of Lex Tex's patent and its infringement. Counsel for Dillon has represented to the court that the transcript of the deposition, taken July 2–3, 1973, shows that Mr. Levinson's examination and testimony concerned different patents owned by Leesona Corporation, a separate plaintiff in MDL 82, and reflects no facts evidencing actual notice to Mr. Levinson of the '912 patent or of any claim concerning its infringement by Dillon.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter in these actions and over all of the parties thereto. 28 U.S.C. §§ 1338(a), 1407.

2. Defendants' motions for summary judgment are governed by the provisions of Rule 56, F.R.Civ.P.

3. Where the facts are plain and readily understood, and the law clearly ascertainable, summary judgment is as appropriate in patent cases as in any others. *See, e.g., Chore-Time Equipment, Inc. v. Cumberland Corporation,* 713 F.2d 774 (Fed.Cir.1983).

4. Defendants' motions for summary judgment are founded primarily upon 35 U.S.C. § 287, which is entitled "Limitation on damages; marking and notice," and which provides as follows:

Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

5. In prescribing the means by which a patentee "may give notice to the public," this statute does not require the marking of "articles" (or "products"). However, the statute generally prevents patentees from collecting damages from infringers for acts done with respect to patented articles by the infringers prior to the time that the patentee gives notice as prescribed by the statute—either by ascertaining that substantially all patented articles made un-

der his authority are marked or by providing each infringer with actual notice of the infringement. *General Electric Co. v. Sciaky Bros., Inc.*, 304 F.2d 724 (6th Cir. 1962); *Lemelson v. Fisher Price Corp.*, 545 F.Supp. 973 (S.D.N.Y.1982).

6. Although Section 287 has been held inapplicable in a situation where there has been no authorized manufacture or sale under the patent, *Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387, 56 S.Ct. 528, 80 L.Ed. 736 (1936), the statute applies to a nonmanufacturing patentee who has licensed or authorized others to produce or sell the patented article. *Gordon v. Easy Washing Machine Corp.*, 39 F.Supp. 202 (N.D.N.Y.1941); *Hazeltine Corp. v. Radio Corporation of America*, 20 F.Supp. 668 (S.D.N.Y.1937). The literal wording of the statute, "patentees, *and persons making or selling* any patented article *for or under them* ...," is susceptible of no other reasonable construction. Since Lex Tex licensed or otherwise authorized numerous textile companies to manufacture and sell the patented yarn, Section 287 is applicable to Lex Tex's claim for damages in this action. Lex Tex's reliance on *dicta* contained in part of a footnote in *Aro Mfg. Co.v . Convertible Top Co.*, 377 U.S. 476, n. 8(4) at 490, 84 S.Ct. 1526, n. 8(4) at 1534, 12 L.Ed.2d 457 (1964) for a contrary proposition is without merit. *Hazeltine Corp. v. Radio Corp. of America, supra,* at 673 (rejecting same argument); *accord Gordon v. Easy Washing Machine Co., supra,* at 202–03.

7. Section 287 applies to all "persons" who make or sell "for or under" the authority of the patentee and thus applies to authorizations by patentee of other persons to make and sell patented articles regardless of the particular form these authorizations may take and regardless of whether the authorizations are "settlement agreements," "covenants not to sue" or "licenses." *Gordon v. Easy Washing Machine Co., supra,* at 203 (predecessor of § 287 held to apply where patentee's authorization was manifested by settlement agreement); *cf., General Pictures Corp. v. Elec. Co.*, 304 U.S. 175, 181, 58 S.Ct. 849, 852, 82 L.Ed. 1273 (1938) (nonexclusive patent license nothing more than "a mere waiver of the right to sue"). Regardless of form, the agreements executed by Lex Tex manifested Lex Tex's authorization of other persons to make and sell articles allegedly covered by the '912 patent; and Lex Tex acknowledged as much in advertisements it placed in the *Daily News Record.* Accordingly, § 287 is clearly applicable.

8. Since Lex Tex failed to obtain appropriate marking of articles produced under the '912 patent in compliance with the first sentence of Section 287, Lex Tex was required to give actual notice to each alleged infringer before it could recover damages from that infringer. *Lemelson v. Fisher Price Corp., supra,* at 976–77; *International Nickel Co. v. Ford Motor Co.*, 166 F.Supp. 551 (S.D.N.Y.1958).

9. Mere knowledge by a defendant of the patent, of Lex Tex's claim of rights thereunder, or even of suits against others, is not a substitute for notice under the statute. Proof of an affirmative notice "of the infringement" is required. *Lemelson v. Fisher Price Corp., supra; Miller v. Daybrook-Ottawa Corp.*, 291 F.Supp. 896, 904 (N.D.Ohio 1968); *Smith v. Dental Products Co.*, 140 F.2d 140, 151–52 (7th Cir.1944) (fact that defendant had "actual knowledge that it was infringing" does not obviate need for notice).

10. Lex Tex's series of trade journal advertisements, the last of which appeared on March 15, 1977, some six years or more before these actions were commenced, did not constitute notice under § 287. These ads, which defendants have no recollection of seeing, did not specify the yarn claims of the '912 patent, did not identify any accused products, and did not name any specific alleged infringer. Moreover, unlike marking, trade journal advertisements have been held inadequate for notice under § 287 as a matter of law. *Lemelson v. Fisher Price Corp., supra,* at 975–76; *Briggs v. Wix Corp.*, 308 F.Supp. 162, 171 (N.D.Ill.1969).

11. *Adorjan Newman Co. v. Richelieu Corporation*, 81 F.Supp. 763 (S.D.N.Y. 1948), relied upon by Lex Tex, is not authority for the proposition that publications or general knowledge in the trade will suffice for purposes of actual notice within the meaning of § 287. The issue before the court in *Adorjan* was not compliance with § 287; rather, the issue was whether a justicable controversy existed for purposes of a declaratory judgment action brought against the patentee by an apparent infringer.

■ 12. Additionally, Lex Tex argues that Barmag and other machinery manufacturers were its "agents," and gave to their customers the notice which the statute required of Lex Tex. However, Barmag and other machinery manufacturers were, at most, nonexclusive licensees of Lex Tex. They were not Lex Tex's "agents," and they could not have supplied actual notice of Lex Tex's specific infringement claim as required by § 287. *Cf. Kourkene v. American BBR, Inc.*, 313 F.2d 769, 772 (9th Cir.1963); *S.S. Kresge Company v. Kamei-Autokomfort*, 363 F.Supp. 257, 260–61 (D.Minn.1973).

■ 13. The filing of a lawsuit charging infringement is deemed to constitute actual notice of the infringement to the defendant for purposes of § 287. Thus, the 1971 action for patent infringement brought by Lex Tex against Butte would ordinarily serve as notice to Butte within the meaning of § 287. However, regard must be had for changes in circumstances and an immediate nonsuit followed by a twelve-year delay will negate the effectiveness of that notice. Furthermore, even if the 1971 suit were held to constitute "actual notice" twelve years later, Lex Tex's claim would be barred by laches and estoppel.

■ 15. The letters dated May 7, 1980 from a Lex Tex lawyer to Butte, Comtex, Hemmerich, and Standard-Coosa-Thatcher did constitute actual notice within the meaning of § 287 to those defendants of the matters set forth in each respective letter. However, under that statute, these defendants are potentially liable for alleged infringement only during the period between receipt of the letters and the expiration of the patent, a period of 28 days or less.

■ 16. Lex Tex's 1970 threat to sue Barmag might have constituted actual notice of alleged infringement had the threat specified the charge of "aiding and abetting" infringement of the yarn claims of the '912 patent and had the threat not been followed by an unreasonable period of delay on the part of Lex Tex. However, any notice arguably conveyed by the 1970 threat was vitiated by Lex Tex's thirteen-year delay and other misleading conduct. *See J.E. Ekornes Fabrikker A/S v. Charlton Co.*, 219 U.S.P.Q. 508, 510, 515 (D.Mass.1982). Furthermore, as noted below, Lex Tex's claim against Barmag is barred by laches and estoppel as well as by 35 U.S.C. § 287.

17. Lex Tex failed to require that allegedly patented articles made by others pursuant to its authority be marked as provided by 35 U.S.C. § 287 and, except as otherwise noted above with respect to Butte, Barmag, Comtex, Standard-Coosa-Thatcher, and Hemmerich during the period from May 7 to June 4, 1980, failed to provide actual notice to any of the defendants in accord with that statute. The December, 1970, oral threat to Barmag and the May 7, 1980, letters to Butte, Hemmerich and Standard-Coosa-Thatcher are immaterial because Hemmerich had ceased operating double heater machines before that date and because Lex Tex's claims against Butte, Standard-Coosa-Thatcher and Barmag are barred by laches and estoppel. The letter to Comtex serves as notice to it as of May 7, 1980.

■ 18. In patent cases, the defense of laches generally serves to bar recovery by the patentee of damages for acts occurring prior to the filing of the complaint, while estoppel generally bars not only relief for past acts but prospective relief for future acts as well. *E.g.,* *Continental Coatings Corporation v. Metco, Inc.*, 464

F.2d 1375 (7th Cir.1972). Because the only patent in suit has expired, there is no practical distinction in this litigation between the effect of laches and the effect of estoppel; however, both defenses are treated below inasmuch as both are urged by various defendants.

19. Laches arises where two conditions are met: (1) a patentee is guilty of an unreasonable and inexcusable delay in asserting his patent rights, and (2) the delay results in material prejudice to the party later accused of infringement. *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741 (Fed.Cir.1984).

20. As in other civil actions, no particular passage of time is necessary in order to make out a laches defense. However, a delay by the patentee of more than six years in asserting his rights creates a presumption of both unreasonableness and prejudice to the alleged defendant, thereby shifting the burden to the patentee to demonstrate that the delay was reasonable and that the defendant was not prejudiced. *Id.* at 741–42. The delays here were greater than six years against some of the defendants.

21. A patentee's involvement in other litigation does not afford him an absolute excuse for failure to assert or enforce his patent against other alleged infringers. The general rule in this regard was recently set forth in *A.C. Aukerman Co. v. Miller Formless Co.*, 693 F.2d 697, 700 (7th Cir.1982):

> Patentees have no obligation to sue all alleged infringers at the same time, *Armstrong v. Motorola, Inc.*, 374 F.2d 764, 769 (7th Cir.), *cert. denied*, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967), but concern with litigation against one asserted infringer does not automatically excuse the patentee from delays in bringing suit against others. *Studiengesellschaft Kohle [v. Eastman Kodak Co.]*, 616 F.2d [1315] at 1327; *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 480 (7th Cir.), *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99

(1975). That excuse is acceptable only if other alleged infringers are given notice of the prior suit, *Advanced Hydraulics*, 525 F.2d at 480–81, and are informed of the patentee's intent to pursue litigation against them at the close of the earlier suit. *Studiengesellschaft Kohle*, 616 F.2d at 1327–28; *Baker Manufacturing Co.*, 430 F.2d at 1015; *Technitrol [Inc. v. Memorex Corp.]*, 376 F.Supp. [828] at 833.

Lex Tex failed to provide defendants with *actual* notice of either the other litigation or Lex Tex's intent to pursue that litigation against them on successful completion of that litigation. Accordingly, Lex Tex's involvement in that litigation does not excuse Lex Tex's delay in enforcing its patent against these defendants.

22. Lex Tex's advertisements in trade publications failed to provide actual notice to any of these defendants of Lex Tex's intent to pursue litigation against them upon successful completion of MDL 82 because there is no evidence that any of these defendants ever saw these notices and because purely constructive notice by newspaper advertisement is inadequate. *Lemelson v. Fisher Price Corp., supra.* Furthermore, even assuming, for sake of argument, that these advertisements somehow might have constituted notice sufficient to invoke "other litigation" as an excuse for Lex Tex's delay, more than six years elapsed between the last of the advertisements and Lex Tex's institution of this litigation. Thus, even if these advertisements might have served, at one time, to invoke the other litigation excuse, Lex Tex's claim is nevertheless barred by laches against those defendants allegedly infringing more than six years before this suit.

23. Impoverishment does not automatically excuse the enforcement of legal rights, thus Lex Tex's argument that it lacked funds to sue all defendants during the period of delay is without merit. *Naxon Telesign Corp. v. Bunker Ramo Corp.*, 686 F.2d 1258, 1261 (7th Cir.1982). For the price of a post card and a stamp, Lex Tex

could have provided these defendants with notice of its intent to pursue litigation against them upon successful completion of MDL 82. *Cf. Miller v. Daybrook-Ottawa Corp., supra,* at 904 (unexplained failure "even to send a postcard" destroys patentee's equities).

24. An argument akin to Lex Tex's contention that defendants have "benefited" as a result of Lex Tex's delay (due to the running of the statute of limitations) was rejected as "spurious" in *Lemelson v. Carolina Enterprises, Inc.,* 541 F.Supp. 645, 655 (S.D.N.Y.1982). Lex Tex's argument runs afoul of the established rule that a delay of six years or more on the part of a patentee is presumptively unreasonable and prejudicial. *Leinoff v. Louis Milona & Sons, Inc., supra,* at 741–42. Indeed, defendants have suffered actual prejudice as a result of Lex Tex's delay in the form of the death of the alleged inventors, lost documents, discarded yarn samples, sold or scrapped machinery, and lost opportunities to mitigate damages.

25. The death of important witnesses such as inventors and the loss of relevant documents and other evidence are among those factors which have been held to constitute prejudice for purposes of laches or estoppel. *See Studiengesellschaft Kohle, supra,* at 1326–27; *Technitrol, Inc. v. Memorex Corp.,* 376 F.Supp. 828, 831 (N.D.Ill.1974) (granting summary judgment on grounds of laches in part because key witnesses, including the inventor, had died during patentee's delay); *aff'd. per curiam sub nom., Technitrol v. NCR Corp.,* 513 F.2d 1130 (7th Cir.1975).

26. These factors are operative in the present instance with respect to Butte, Barmag and Standard-Coosa-Thatcher, all of which have suffered actual prejudice as a result of Lex Tex's unreasonable delay. The court can not rule on the laches defense of the other defendants. The record does not contain sufficient evidence of when Lex Tex knew or should have known of their infringement. Therefore, the court can not tell whether or not they can benefit from the presumption of unreasonable delay after six years. *J.E. Ekornes, supra,* at 511.

27. The defense of estoppel is similar to laches except that estoppel requires some " 'representations or conduct [on the part of the patentee] which justifies an inference of abandonment of the patent claim or that the patentee has induced the [alleged] infringer to believe that "its business would be unmolested" and that the defendant has acted upon such inference to his detriment.' " *Olympia Werke Aktiengesellschaft v. Gen. Elec. Co.,* 712 F.2d 74, 77 (4th Cir.1983). Estoppel defenses have been sustained against patentees where the patentee's behavior toward the alleged infringer meets one of two general patterns. The first pattern occurs where there is an explicit threat of infringement action followed by a lengthy period of inaction on the part of the patentee with prejudice to the defendant. *See Naxon Telesign Corp. v. Bunker Ramo Corp.,* 686 F.2d 1258, 1266 (7th Cir.1982) (affirming summary judgment on grounds of estoppel where patentee delayed for 58 months following threat). *J.E. Ekornes, supra,* at 515 ("[W]hen silence is preceded by affirmative acts disclosing an intent to legally enforce the patents if certain conditions are not met, subsequent inaction taints those prior acts as misrepresentations."). The second pattern occurs where the activities which are the subject of the patentee's infringement action were induced or encouraged by the patentee himself. *See generally Olympia Werke Aktiengesellschaft v. Gen. Elec. Co., supra,* at 80.

28. Lex Tex's suit against Standard-Coosa-Thatcher in 1972 for a breach of a royalty agreement meets the first pattern of facts raising an estoppel defense. After dismissal of this suit for lack of jurisdiction, Lex Tex took no action prior to this suit. The prejudice from delay has already been discussed.

29. The same is true of Butte. It was sued in 1971 by Lex Tex on the '912 patent, but the action was voluntarily dismissed

and was not pursued until this case was filed.

30. Lex Tex's suit against Barmag on the '912 patent meets both patterns which give rise to estoppel defenses in patent cases. Lex Tex threatened to sue Barmag in 1970 but waited thirteen years—until Barmag's commitment to the United States market had increased very significantly—before filing this lawsuit on patent '912. Lex Tex's claims against Barmag, Standard-Coosa-Thatcher, and Butte, are barred by both laches and estoppel.

31. Lex Tex's argument that Barmag's infringement was "wilful," and that Barmag may not resort to equitable defenses is also without merit. Even if Barmag's infringement were "wilful," that would not deprive Barmag of equitable defenses. The applicable rule is that the conduct in question must be compared with that of Lex Tex in light of the entire history of relations between the parties. *J.E. Ekornes, supra,* at 513 (rejecting notion that closely copying an item known to be patented deprives defendant of equitable defenses). The conclusion is inescapable that any alleged "wilful" infringement on the part of Barmag was insignificant compared to the overall demeanor of Lex Tex.