**WAFER SHAVE, INC., Plaintiff,**

v.

**The GILLETTE COMPANY, Defendant.**

**C.A. No. 89–0720–WF.**

United States District Court,
D. Massachusetts.

Oct. 12, 1993.

Alan R. Hoffman, Lynch, Brewer, Hoffman & Sands, Boston, MA, Thomas J. Filarski, Richard H. Compere, Jerold A. Jacover, John Cline, Willian Brinks Old Hofer Gilson & Lione, Ltd., Chicago, IL, David H. Badger, Daniel L. Boots, Willian Brinks, Olds Hofer Gilson & Lione, Ltd., Indianapolis, IN, Donald B. Gould, Goodwin, Proctor & Hoar, Boston, MA, for plaintiff.

Marshall D. Stein, Cherwin & Glickman, Boston, MA, John E. Nathan, Patricia A. Martone, Denise L. Loring, Joseph H. Guth, John M. Desmarais, Fish & Neave, New York City, for defendant.

### MEMORANDUM AND ORDER

WOLF, District Judge.

This case involves a claim of a patent infringement brought by Wafer Shave, Inc., ("Wafer Shave") against the Gillette Company ("Gillette"). Wafer Shave is the owner of a patent for a lubricating disc, a men's shaving accessory, that is used to distribute lubricant on a person's face before shaving in place of shaving cream. Wafer Shave alleges that the lubricating strip attached to the head of many Gillette razors just above the blade infringes Wafer Shave's patent.

Gillette has moved for summary judgment on the equitable defenses of laches and estoppel, arguing that because of Wafer Shave's conduct and its effects on Gillette,

Wafer Shave should be barred from recovering pre-filing damages on the basis of laches, and from maintaining its claim altogether on the basis of estoppel. Wafer Shave has filed a cross-motion for partial summary judgment, seeking a ruling that on the undisputed facts Gillette's defenses of laches and estoppel are without merit. After complete discovery on the issues of laches and estoppel, including thousands of pages of deposition testimony, extensive briefing, and oral argument, this court finds that, for the reasons set forth below, Gillette's motion for summary judgment must be granted and Wafer Shave's motion for partial summary judgment must be denied.

## I. FACTS

The relevant undisputed facts include the following. In 1976, Joseph Jennings, Sr., the inventor of the lubricating disc, received a patent (the "Jennings patent") for his invention. Mr. Jennings died in 1984, and bequeathed ownership of the Jennings patent to his wife, Mrs. Elsie Jennings. Wafer Shave's Statement of Material Facts ("Wafer Shave Facts") 29. In 1989, the patent was transferred to Wafer Shave, a corporation formed by Mrs. Jennings and her children in order to conduct this litigation and, evidently, to limit their possible personal liability to Gillette in connection with this case. Gillette Exhibit 51 ("Joseph Jennings, Jr. Dep") at 111–112.

Mr. Jennings' invention consists of a disc containing a substance commonly known as Polyox, a lubricant. The disc is a separate item from the razor, and is intended to be rubbed vigorously over the facial area before shaving in order to deposit a film of lubricant on the skin that substitutes for shaving cream. Wafer Shave Facts 1–6; Gillette's Consolidated Statement of Material Facts ("Gillette Facts") 14–16. The Jennings patent covers the method of shaving he developed. Wafer Shave Exhibit 3; Gillette Fact 14. Mr. Jennings submitted his product to Gillette's facility in Boston, Massachusetts, in 1974 and 1979 in the hope that Gillette would buy it. Both times it was rejected. Wafer Shave Facts 12–25; Gillette Facts 216–222, 230–236.

In 1977, at a facility in England, Gillette began to develop a razor with a lubricating strip which also contained Polyox. Gillette Fact 10. However, unlike Mr. Jennings' disc, the lubricating strip was not meant to replace shaving cream and was attached to the top of the razor's head to lubricate the skin immediately after the blade has passed over it. Gillette Facts 10–14. Gillette contends that its lubricating strip was developed in England completely independently of Gillette's interactions with Mr. Jennings in Boston. There is no evidence that the information which Mr. Jennings provided to Gillette in Boston was communicated to England or otherwise used to develop Gillette's lubricating strip. Gillette began to market razors with lubricating strips in March of 1985, with the introduction of its ATRA PLUS razor. Gillette Fact 24.

During the Spring and Summer of 1985, the licensee of the Jennings patent and his attorney expressed to Gillette their belief that Gillette's lubricating strip products infringed the Jennings patent. At first, in April and May of 1985, Roy Carver, the exclusive licensee, telephoned and wrote Gillette expressing an interest in discussing the similarity of Wafer Shave's product and the lubricating strip then being manufactured for Gillette's ATRA PLUS razor. Gillette Facts 24, 27; Wafer Shave Fact 64. Carver expressed the view that "our product and the ATRA PLUS will be complimentary [sic] to each other, not in competition." Wafer Shave Exhibit 101. Gillette interpreted Carver's letter as a renewed effort to sell the Jennings patent and responded that it was still not interested. Wafer Shave Exhibit 102.

On June 7, 1985, Burton Amernick, an attorney for Carver and Mrs. Jennings, wrote to Gillette charging it with patent infringement to the extent that its ATRA PLUS razor incorporated a lubricating strip. The letter stated:

> We represent both the owner and the exclusive licensee of U.S. Patent 3,956,951 [the Jennings patent]. It has come to the attention of our clients that The Gillette Company is manufacturing and/or offering for sale a product under the name of "Atra

Plus." According to our understanding, this product includes a lubricating strip placed just above the twin blades on each razor blade cartridge. The strip includes polyethylene oxide which is released onto the skin when the strip becomes moistened during shaving....

Please be advised that the use of the above-described "Atra Plus" product in shaving is covered by U.S. Patent 3,956,-951....

In view of the above, we demand that The Gillette Company cease and desist from making, using, or selling the above-described product or any other which would violate our clients' patent rights.

We would appreciate your response to this matter within fourteen (14) days of this letter confirming that Gillette will cease and desist as requested or, in the alternative, providing an explanation as to why the use of the above product in shaving does not violate any claim in the patent. Otherwise, we will initiate appropriate action.

Wafer Shave Exhibit 104. Gillette responded on June 14, 1985, with a brief letter, and then on July 17, 1985, provided Amernick with a detailed explanation distinguishing the two products. The second letter indicated that after consultation with technical experts and outside counsel, Gillette had concluded that its product did not infringe the Jennings patent. Wafer Shave Exhibits 105–106. Three months later, on October 30, 1985, Amernick responded to Gillette's July 17, 1985 explanation, stating:

[W]e remain of the strong opinion that the use of Gillette's "Atra Plus" product in shaving is covered by U.S. Patent 3,956,-951.

Accordingly, we must continue our demand that The Gillette Company cease and desist from making, using, or selling the above-mentioned product or any other which would result in violating our client's rights.

Wafer Shave Exhibit 107. Gillette responded on November 22, 1985, requesting the reasons for Amernick's opinion that its patent was infringed. Wafer Shave Exhibit 108.

Wafer Shave did not respond to this request. Gillette Fact 72.

Six months later, on May 16, 1986, Mrs. Jennings wrote to Gillette explaining that the license agreement with Carver had been terminated and asking if Gillette would be interested in purchasing the Jennings patent. Wafer Shave Exhibit 109. It was evident from her letter that Mrs. Jennings was no longer represented by Amernick and she did not reassert his claim of patent infringement. *See* Gillette Exhibit 165 ("Mullaney Dep.") at 64–66. Rather, unlike Amernick's correspondence, which had taken place with Gillette's legal department, Mrs. Jennings' communication was addressed to the President of Gillette, Joseph Turley. On May 23, 1986, Gillette responded requesting the terms of Mrs. Jennings' offer. Wafer Shave Exhibit 110. On May 29, 1986, Mrs. Jennings wrote, offering a sale of the Jennings patent and another related patent for $330,000. Wafer Shave Exhibit 111. Gillette informed Mrs. Jennings on July 23, 1986, that it rejected the offer, but suggested it might consider a non-exclusive license and requested proposed terms for such an arrangement. Wafer Shave Exhibit 112. Mrs. Jennings did not respond to this request. Gillette Facts 98, 102; Wafer Shave Fact 85. None of these communications mentioned Amernick's prior communications with Gillette's legal department or any charges of patent infringement.

After Mrs. Jennings' correspondence in 1986 and prior to March, 1989, Gillette invested heavily in its lubricating strip products. Gillette Facts 152–160. Gillette introduced on the market several razors with lubricating strips, and spent over $50,000,000 advertising its new products in the United States. Gillette Facts 152, 159. In addition, in 1988, Gillette authorized the expenditure of over $100,000,000 for the development of its SENSOR razor, which incorporates a lubricating strip. Gillette Fact 160–161. Mrs. Jennings was continuously aware that Gillette was making a massive investment in developing and selling products with the lubricating strip. Indeed, the evidence includes a November, 1987 advertisement for Gillette's GOOD NEWS! PLUS razor on which Mrs. Jennings wrote "DARN THEM!!!" Gillette Exhibit 110.

On March 31, 1989, three years and five months after Amernick last charged Gillette with infringement, and two years and nine months after the last communication between Mrs. Jennings and Gillette, Wafer Shave, which was formed to conduct this litigation, filed suit in this court alleging patent infringement.[1] Additional undisputed facts, as well as other evidence, are discussed in the analysis which follows.

## II. DISCUSSION

Under the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). A factual dispute is genuine only " 'if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.' " *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). On a motion for summary judgment, the court must view the undisputed facts in the light most favorable to the non-moving party. *See Attallah v. United States,* 955 F.2d 776, 779 (1st Cir. 1992).

The cross motions for summary judgment in this case address only the issues of laches and estoppel. With respect to estoppel, Gillette asserts that plaintiff's failure to pursue the initial charge of patent infringement for almost four years, taken together with the intervening communications proposing the sale of the patent, misled Gillette into believing that Wafer Shave had abandoned its claim, and that Gillette relied to its detriment on that mistaken belief. In addition, with respect to laches, Gillette asserts that the delay in filing suit was unreasonable and unexcused.

### A. *The Applicable Law*

In 1992, the Court of Appeals for the Federal Circuit reformulated the legal elements that must be proven to establish the defenses of laches and equitable estoppel in

patent infringement suits. *See A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020 (Fed.Cir.1992) (en banc). Most notably, the court rejected its prior statement of the law in *Jamesbury Corp. v. Litton Industrial Products, Inc.,* 839 F.2d 1544 (Fed.Cir.1988), and clarified that the elements of laches are not merely a subset of the elements of estoppel.

 Pursuant to *Aukerman,* in order to succeed on a defense of laches, a party must show that:

(a) the patentee's delay in bringing suit was unreasonable and inexcusable; and

(b) the alleged infringer suffered material prejudice attributable to the delay.

*Id.* The time of the delay is measured from when the patentee knew or should have known of the alleged infringement. A presumption of laches arises if the delay is more than six years, the effect of which is to shift the burden of going forward with the evidence, but not the burden of persuasion, to the patentee. *Id.* In essence a defense of laches requires the court to look at the patentee's conduct from the patentee's perspective and also to consider its effect on the alleged infringer.

 In order to succeed on a defense of equitable estoppel, a party must show that:

(a) The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction, or silence where there is a duty to speak.

(b) The alleged infringer relies on that conduct.

(c) Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*Id.* Thus, the defense of estoppel requires the court to analyze the facts from the defendant's perspective. Unlike laches, estoppel requires a showing that the defendant was reasonably misled by the patentee's conduct and relied on that conduct in a way that

---

1. Although Wafer Shave was not incorporated until 1989, the term "Wafer Shave" is at times

used in this Memorandum to represent everyone who had an interest in the Jennings patent.

caused material harm. No presumptions apply to the defense of estoppel. In addition, the court in *Aukerman* clarified that unlike laches, estoppel does not require a showing of unreasonable delay. *Id.* at 1041–42.

Moreover, "[a]s equitable defenses, laches and equitable estoppel are matters committed to the sound discretion of the trial judge." *Id.* at 1028. Even if the specific elements of laches or estoppel are established, the court "must take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion ..." *Id.* at 1043. Thus, an otherwise meritorious laches or estoppel defense may be defeated if it is shown that the defendant is guilty of egregious conduct, such as copying. *Id.* at 1033, 1043–44.

A successful laches defense bars all damages incurred before the filing of the suit. *Id.* at 1028. A successful estoppel defense bars all of a patentee's infringement claims. *Id.*

### B. *Equitable Estoppel.*

As a meritorious estoppel defense would bar all of Wafer Shave's claims, the court analyzes the motion for summary judgment based on estoppel first. As indicated earlier, in order to succeed on a defense of equitable estoppel, Gillette must show that Wafer Shave's misleading conduct led Gillette to reasonably infer that Wafer Shave had abandoned its claim, that Gillette reasonably relied on Wafer Shave's misleading conduct, and that Gillette will now suffer material prejudice as a result of its reliance if Wafer Shave is permitted to proceed. *See Aukerman,* 960 F.2d at 1028. Therefore, unlike laches, which requires an examination of whether a patentee's conduct was reasonable or excusable, estoppel focuses on the effect of the patentee's conduct on the alleged infringer, not on the reasons for the patentee's conduct. *Id.* at 1043.

### 1. *Wafer Shave's Conduct was Misleading.*

Gillette's allegations fall within the *Aukerman* court's description of "the most common [estoppel] situation," in which "the patentee specifically objects to the activities

currently asserted as infringement in the suit and then does not follow up for years." 960 F.2d at 1042. Gillette alleges that Wafer Shave explicitly threatened suit in its 1985 letters and then remained silent with respect to any claim of infringement for a period of years, while Gillette continued to develop, advertise, and sell its allegedly infringing products. In reviewing the defense of estoppel, the court must determine whether the patentee's conduct was misleading from the perspective of the alleged infringer. *Aukerman,* 960 F.2d at 1043. The issue is "whether [Wafer Shave's] course of conduct reasonably gave rise to an inference in [Gillette] that [the patentee] was not going to enforce [its] patent[ ] against [Gillette]." *Id.* On a motion for summary judgment, the defendant must show that such an inference is the only possible inference. *Id.* at 1043–44.

Wafer Shave first contends that its 1985 communications did not constitute a threat of litigation. Courts have generally held that in order for a patentee's silence to be considered misleading, the patentee must first "threaten[ ] prompt and vigorous enforcement of the patent." *Continental Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375, 1380 (7th Cir.1972); *see also J.E. Ekornes Fabrikker A/S v. Charlton Co., Inc.,* 219 U.S.P.Q. 508 (D.Mass.1982) (communication must imply patentee's intent to take legal action); *cf. Meyers v. Asics Corp.,* 974 F.2d 1304 (Fed.Cir.1992) (no estoppel where no threat of litigation). In this case, Amernick's letters of June 7, 1985, and October 30, 1985, contained explicit "cease and desist" demands. The June 7, 1985 letter also contained a statement that Wafer Shave would "initiate appropriate action" if Gillette did not either explain its position or cease its allegedly infringing conduct. In *J.E. Ekornes Fabrikker,* the court found that the patentee's demand that the alleged infringer cease and desist before entering into license negotiations "comprised an expression of intent to take legal action if [the infringer] failed to make corrective efforts." 219 U.S.P.Q. at 515. Similarly, although Amernick did not explicitly state that the patentee would immediately file suit if Gillette did not comply, the only reasonable inference one could draw from his initial assertion that his client would

"initiate appropriate action" if Gillette did not "cease and desist" or provide an explanation of why Gillette was not infringing the Jennings patent, and from his reassertion after receiving that explanation of his demand that Gillette cease and desist is that the patentee intended to commence litigation if Gillette did not indeed cease and desist.

The court understands that, for the purposes of estoppel, whether Wafer Shave threatened litigation must be determined based on what was actually communicated to Gillette. However, evidence of what a party intended to communicate may illuminate what message was received. Although the court relies only on what was expressed to Gillette, its conclusion that a reasonable fact-finder must infer that Amernick threatened litigation is consistent with plaintiff's internal communications and documents, which were first disclosed to Gillette during discovery in this case. For example, in 1985, Carver told a prospective marketer of Wafer Shave that the sale of a license to Gillette would be "the result of litigation or as a settlement of litigation already commenced ..." Gillette Exhibit 92 (Memorandum from Carver to Tom Flynn, dated June 6, 1985) at 2. Similarly, it appears that Mrs. Jennings believed that litigation had been instituted by Carver. Gillette Exhibit 161 ("Mrs. Jennings Dep.") at 239. Mrs. Jennings testified, "Perhaps you will recall that previous to Carver defaulting, he had instigated a lawsuit against Gillette ..."

Wafer Shave's reliance on *Meyers, supra, Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290 (Fed.Cir.1992), and *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570 (Fed.Cir.1987), three cases in which the Court of Appeals for the Federal Circuit reversed grants of summary judgment on the basis of estoppel, is misplaced. In *Meyers*, the court declined to hold that plaintiff had threatened litigation, finding that the plaintiff's communications consisted primarily of license negotiations, and that although the plaintiff did accuse the defendants of infringement, he did not make any demands on the defendants or threaten to take action against them. 974 F.2d at 1305, 1308–09. In *Hemstreet*, the court held that the patentee's

silence was not misleading because: (1) the patentee had not threatened immediate litigation prior to the silence, but had only offered licenses and provided information about other lawsuits; and (2) the infringer, not the patentee, had failed to respond at the end of a series of communications. 972 F.2d at 1292–94. In *Hottel*, as in the present case, the plaintiff communicated to the defendant its intention to pursue its legal claim. However, the plaintiff explicitly stated, "we are appealing a decision rendered in [another] matter and intend to pursue actively our patent claims upon receipt of the ruling," thus warning the defendant that the filing of suit would be delayed. 833 F.2d at 1572–74. Therefore, the *Hottel* court found that as the plaintiff had not threatened immediate action, the silence which followed was not misleading.

In the present case, Amernick's threat of litigation became misleading when it was followed by several years during which the patentee did not reassert the infringement claim. This period of silence began when Amernick failed to respond to Gillette's November 22, 1985 letter requesting reasons for his assertion of infringement. It was interrupted only by Mrs. Jennings' correspondence concerning the sale of the patent with the President of the Gillette from May to July, 1986. Neither of Mrs. Jennings' letters mentioned the infringement claim. The sale negotiations ceased when Mrs. Jennings failed to respond to Gillette's July 23, 1986 letter suggesting that she propose terms for a non-exclusive license. Gillette did not hear about this matter again until Wafer Shave, which was formed as a vehicle to conduct this litigation, filed suit in March, 1989. The conduct consisting of: (1) Amernick's letters in 1985 threatening "appropriate action;" (2) Mrs. Jennings failing to communicate any continuing intention to press a claim of infringement for three years and five months (October, 1985–March, 1989); and (3) Mrs. Jennings' communications mentioning only the possibility of selling the patent or a license to Gillette, would inevitably mislead someone in Gillette's position to believe that the patentee, then Mrs. Jennings, did not intend to pursue Amernick's earlier infringe-

ment claim. A reasonable factfinder could not find otherwise.

Furthermore, during this period of silence, Gillette continued massive advertising and sales of its allegedly infringing products. Gillette Facts 152–160. Amernick's initial letter in 1985 spoke of the ATRA PLUS razor, evidencing his awareness that Gillette was marketing at least one of its lubricating strip products. Given the magnitude of subsequent advertising and sales, Wafer Shave was undoubtedly aware that Gillette was continuing to invest heavily in the sale of products that Wafer Shave now alleges violate the Jennings patent. In fact, as described earlier, in November, 1987 Mrs. Jennings clipped a Gillette advertisement for its GOOD NEWS! PLUS razor and noted "DARN THEM!!!" on the clipping. Gillette Exhibit 110. Mrs. Jennings' silence in the face of Gillette's expansion strengthens the inference that the failure to reassert its patent infringement claim for over three years was misleading.

 It now appears that Mrs. Jennings had not actually decided to abandon the previously expressed intention to sue Gillette, but rather had difficulty raising funds and retaining appropriate legal counsel. Wafer Shave Facts 90–95. This, however, was never communicated to Gillette. It would not have been onerous for Mrs. Jennings and her associates to convey to Gillette their continuing intention to seek to enforce the Jennings patent; a simple statement to this effect on a postcard probably would have sufficed. *See, e.g., In re Yarn Processing Patent Validity Litigation,* 602 F.Supp. 159, 172 (W.D.N.C. 1984) (noting that patentee's failure to send even a postcard destroys patentee's equities) (citing *Miller v. Daybrook–Ottawa Corp.,* 291 F.Supp. 896, 904 (N.D.Ohio 1968)); *Advanced Hydraulics, Inc. v. Otis Elevator Co.,* 525 F.2d 477, 481 (7th Cir.1975) (holding that patentee should have given notice of pending litigation that caused delay); *cf. Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570 (Fed.Cir.

1987) (no estoppel where patentee informed defendant that it would await a ruling in another case before pursuing litigation). It is incumbent on a patentee to inform an accused infringer of its reasons for failing to initiate a previously threatened suit and its continuing intention to do so. "This 'requirement' is a matter of logic.... [The true reasons a suit is not initiated earlier] cannot enter into whether [the alleged infringer] drew an inference that it would not be sued if such facts are not known to [it]." *Aukerman,* 960 F.2d at 1044.

It is, therefore, immaterial to the issue of estoppel that there were reasons for the delay in filing suit, since those reasons were not communicated to Gillette or otherwise known by it.[2] *Aukerman,* 960 F.2d at 1044. Thus, the only inference a reasonable factfinder could draw in this case is that plaintiff's conduct was misleading.

The facts of this case are similar to those in *Advanced Hydraulics, Inc. v. Otis Elevator Co.,* 525 F.2d 477, 481 (7th Cir.), *cert. denied,* 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975). In *Advanced Hydraulics,* the court found misleading conduct where: the plaintiff threatened immediate action if the defendant did not respond to plaintiff's claim of patent infringement; defendant responded explaining that it took the position that its product did not infringe and requested an explanation of plaintiff's claim; and plaintiff did not respond until filing suit five years later. *Id.* Like the defendant in *Advanced Hydraulics,* Gillette was threatened by Amernick with a patent infringement suit; explained why it believed it was not infringing the patent; received no response to its request for Amernick's reasons for his claim of infringement; later was informed that Carver's license had been terminated and received from Mrs. Jennings an offer to sell the patent which was silent on the issue of infringement, thus suggesting that Amernick's claim had been abandoned; and heard

---

2. The decision in *Choat v. Rome Industries, Inc.,* 462 F.Supp. 728 (N.D.Ga.1978) is inapposite. Although the facts of *Choat* are similar to the facts of this case, the *Choat* court held that the defendant could not succeed in his defense of estoppel in part because the plaintiff had not intentionally mislead the defendant. The *Aukerman* court has clarified that the intentions of the plaintiff are irrelevant to the issue of estoppel, if they are not communicated to the defendant. 960 F.2d at 1043–44 & n. 18.

nothing about the infringement claim for several years.

As the court in *Aukerman* stated, "There is ample precedent that equitable estoppel may arise where, coupled with other factors, a patentee's 'misleading conduct' is essentially misleading *inaction*." 960 F.2d at 1042 (emphasis in original) (citing *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573–74 (Fed.Cir.1987)). This is such a case.

### 2. *Gillette was misled by Wafer Shave's conduct.*

The evidence further demonstrates that a reasonable factfinder would have to conclude Gillette was actually misled by plaintiff's silence into believing that the claim of patent infringement made by Amernick had been abandoned. In 1986, when the legal department was informed that Mrs. Jennings had proposed a sale of the patent to Gillette's president, its reaction was that the legal claim of patent infringement had been dropped. As Gillette's Vice President and General Counsel, Joseph Mullaney testified, "[W]e clearly saw no reassertion of any legal claim here. . . . We now had a problem that we could deal with as a business matter and not as a legal matter." Gillette Exhibit 165 ("Mullaney Dep."), at 65. If the evidence ended here, however, Wafer Shave might have a triable case. Gillette apparently remained at least aware of the possibility of suit, as the legal department suggested that the business department assess Mrs. Jennings' offer in terms of "what amount (if any) [Gillette] would be willing to pay to Mrs. Jennings to achieve freedom from suit under [the Jennings patent.]" Wafer Shave Exhibit 40.

After the conclusion of the 1986 business communications, however, the patentee remained silent for an additional two years and nine months. Gillette's internal documents support its assertion that this delay caused Gillette to conclude that the patent infringement claim had been abandoned. In January, 1986, the annual Management Reporting Form for Scott Foster, a member of Gillette's patent counsel staff, listed as one of Foster's legal objectives, "In *Jennings* matter, respond as necessary to allegation of

infringement." Gillette Exhibit 134. In January, 1987, Foster's Management Reporting Form listed the objective and stated "Objective met. Matter has been closed." *Id.* Similar entries were made on the 1986 and 1987 forms for Raymond DeVellis, Gillette's senior patent counsel. *Id.*

Consistent with this, the 1986 list of "Legal Department Objectives," prepared by Mullaney, the department head, and submitted to Colman Mockler, the Chairman of the Board of Directors of Gillette, contained an entry stating, "In *Jennings* matter, respond as necessary to allegation of infringement." *Id.; see also* Gillette Exhibit 166 ("Mockler Dep.") at 6. In preparing the list of "Legal Department Objectives" for 1987, Mullaney struck out the entry concerning the Jennings matter. *Id.* Mullaney testified that at the time that he prepared the 1987 objectives he believed that the "matter . . . had been closed." Mullaney Dep. at 58.

Wafer Shave's argument that Gillette's outside lawyers mentioned Wafer Shave in its annual letters to Gillette's auditor's through 1989 does not place in dispute the fact that Gillette believed Wafer Shave had abandoned its claim. *See* Gillette Exhibit 153. The letters were not prepared by an employee of Gillette, but by Willis Ertman, an attorney at Fish and Richardson, one of Gillette's outside counsel. Gillette Facts 113–116. Ertman testified that the letters were prepared in response to an auditor's request sent by Gillette, and that Ertman sent the request to the attorneys at his firm and asked them to report on matters they were working on for Gillette. Gillette Exhibit 168 ("Ertman Dep.") at 143–48. Ertman testified that he did not speak with anyone at Gillette in the process of writing the letters, as "the inquiry, as [he] understood it, was whether [Fish and Richardson] had been consulted . . ." *Id.* at 147–48. Furthermore, the specific reference to the Jennings patent in the letters is consistent with Gillette's internal reports indicating the Jennings matter was closed. The 1988 and 1989 letters simply stated, "We have heard nothing further in connection with the charge of patent infringement of [the] Jennings [patent] . . ." Gillette Exhibit 153. Moreover, the record

does not indicate that the auditors included any reference to the possibility of litigation concerning the Jennings patent in their 1988 and 1989 reports.[3]

While on summary judgment the evidence must be viewed in the light most favorable to Wafer Shave, the court must consider all of the evidence and the inferences which could legitimately be drawn from it. In this context, the reference that nothing had been heard concerning the Jennings patent in the 1988 and 1989 letters from outside counsel is not sufficient to create a triable issue concerning reliance. Rather, considering all the evidence, a reasonable factfinder could only conclude that Gillette had been misled by Wafer Shave's silence into inferring that Amernick's claim of patent infringement had been abandoned.

3. *Gillette relied on its belief that Wafer Shave had abandoned its claim.*

 Evidence that Gillette took significant steps in reliance on its belief that the patent infringement claim had been abandoned further supports the inference that Gillette was misled by the patentee's conduct. "To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security ..." *Aukerman,* 960 F.2d at 1043. In this case, Gillette was advised by its counsel that it was not infringing the Jennings patent. The fact that Gillette may have relied in part on this advice does not negate the fact that it also relied on the patentee's apparent abandonment of Amernick's infringement claim. *See MCV, Inc. v. King–Seeley Thermos Co.,* 870 F.2d 1568, 1573 (Fed.Cir.1989) (inventor's position that co-inventor did not need to be named on patent was based on reliance on both his own interpretation and plaintiff/co-inventor's silence); *Advanced Hydraulics,* 525 F.2d at 479 (reliance on patentee's misleading conduct found even though infringer had also informed patentee that infringer's internal

investigation had indicated that there was no infringement). To find otherwise would encourage those accused of infringement not to seek legal advice, but to rely solely on a patentee's future conduct and to have faith that such conduct will prevent the patentee from succeeding in a lawsuit. Such a practice would injure the ability of alleged infringers to protect their legal rights,[4] and discourage the efficient resolution of accusations of infringement which a fully informed, well-advised person would find meritorious, or at least too risky to litigate.

Gillette's reliance is evidenced by the actions it took after it had inferred that the patentee had abandoned the patent infringement claim. As described earlier, Gillette's legal department ceased to consider Wafer Shave an issue. It removed Wafer Shave from its list of claims that it brought to the attention of Chairman Mockler.

Gillette also continued to expand its lubricating strip lines. *See Advanced Hydraulics,* 525 F.2d at 481 (detrimental reliance found when infringer continued to invest in and expanded allegedly infringing business during five-year delay). There is meaningful evidence, however, that Gillette's decision to introduce new product lines incorporating the lubricating strips was not significantly affected by the patentee's silence. David Preston, the President of Gillette's Razor division, testified that Gillette may have continued its expansion of its lubricating strip line even if Gillette had known that the patentee would continue to press its claim, since Gillette had already formed the opinion that its product did not infringe the Jennings patent. Gillette Exhibit 165 ("Preston Dep.") at 168–82. Furthermore, Gillette did not alter its business plans in the face of a lawsuit filed by Warner–Lambert alleging a similar patent infringement claim. Wafer Shave Fact 129.

There is, however, significant evidence that if Gillette had been aware of the patentee's

---

3. Despite voluminous filings by both parties, the record does not contain copies of Gillette's annual auditor's report of other documents incorporating any opinions the auditors expressed concerning the possibility or merits of any potential litigation.

4. In particular, an accused infringer who decides not to seek the advice of legal counsel about whether its product infringes runs the risk of being found guilty of willful infringement. *See* discussion *infra,* at Part II.B.6.

intentions, it would have at least reviewed the patent infringement claim more carefully, and reviewed its business plans in light of that claim. As Scott Foster, a member of Gillette's legal staff, stated:

We probably would have held meetings with the engineering people to see if there was a way around the patent without question, one that couldn't be questioned by anybody.... [O]ne other consideration was simply not or at least to delay coming out with products that were scheduled to be introduced that would have a lubricating facility.

Gillette Exhibit 164 ("Foster Dep.") at 62.

More directly, the fact that Gillette failed to take affirmative actions to protect itself from a lawsuit seeking many millions of dollars in damages, such as the one it is facing now, is evidence of its reliance. After Mrs. Jennings failed to respond to the suggestion of a non-exclusive license, Gillette dismantled its legal efforts concerning the Jennings patent. It also did not try to mitigate possible damages by effecting a quick settlement or initiating a declaratory judgment action. Foster testified that if Gillette had known that Wafer Shave intended to press its claim:

[o]utside counsel would have been instructed to dig deeply, thoroughly into the patent. We ourselves in-house would have done whatever we could to determine the merits of the patent ... negotiating a resolution, possibly filing a DJ [declaratory judgment] action to clear the air one way or another.

*Id.* Gillette had the opportunity, for instance, to accept Mrs. Jennings' offer and buy the patent for a mere $330,000 in order to eliminate its exposure to being required to incur substantial legal fees and to being held liable for substantial damages in an infringement suit. Gillette's assertion that it would have acted to limit its possible exposure if it believed the patentee continued to claim infringement is fully supported by the fact that when Warner–Lambert raised similar patent claims in the same period, and persistently pursued them, Gillette filed a declaratory judgment action. Gillette Fact 147; Gillette Exhibit 80 at 74, 99; Wafer Shave Exhibit 68.

Finally, as explained below, Gillette did not preserve documentary or testimonial evidence necessary for litigation of the infringement claim. This too is evidence that Gillette was actually mislead into believing that it would never have to litigate a claim that it had infringed the Jennings patent. Accordingly, on this record, a reasonable factfinder could only infer that Gillette actually relied on plaintiff's misleading conduct.

4. *Gillette's reliance was reasonable.*

In light of the plaintiff's conduct and the facts known by Gillette, Gillette's reliance on its inference that the patentee had abandoned Amernick's claim of infringement was reasonable. As noted above, Gillette was faced with a series of letters threatening litigation in 1985. The patentee may not have accepted Gillette's explanation of why it was not infringing the Jennings patent, but never responded to Gillette's request to explain its position. When Gillette received Mrs. Jennings' offer to purchase the Jennings patent, without any renewed mention of Gillette's purported infringement, and Mrs. Jennings later failed to respond to Gillette's suggestion of a possibility of a non-exclusive license, Gillette's reliance on its belief that the earlier infringement claim had evaporated was reasonable.

As three years and five months from Wafer Shave's last threat, and two years and nine months from the last communication between the parties passed, it became increasingly reasonable for Gillette to believe that the patentee had decided not to pursue the claim of patent infringement Amernick had asserted. *See Aukerman,* 960 F.2d at 1044 (noting "the longer the delay, the stronger the inference [that the patentee has abandoned its claim] becomes."). During this time, Gillette continued massive advertising and sales of its allegedly infringing products. Anyone in its position would have reasonably expected at least a brief reiteration of the infringement claim if the patentee intended to reassert it.

On the basis of this information, the only reasonable inference Gillette could draw was that the patentee had abandoned the infringement claim. Given the lack of any

information to alter this inference, it was reasonable for Gillette to proceed in reliance on it. This case is, therefore, distinguishable from *Aukerman*, in which the defendant's initial response to the allegation of infringement was that if the patentee sued, its recovery would be limited to $200–$300 a year. 960 F.2d at 1044.[5] Thus, the court found that the communications between the parties could have led the defendant to infer that the patentee did not sue promptly because the original violation was *de minimus*, not that the patentee was abandoning its claim and would tolerate the massive infringement which allegedly occurred years later. *Id.* Thus, the grant of summary judgment was reversed. *Id.*

In the present case, the evidence would not permit a reasonable factfinder to conclude that any such alternative reasonable inferences could have been drawn by Gillette. Although the patentee had not in fact abandoned her claim, Gillette was not made aware of any information to suggest that she had not. Thus, it must be concluded that its reliance was reasonable.

5. *Gillette was materially prejudiced.*

The final element of an estoppel claim is prejudice. The *Aukerman* court recognized that "such prejudice may be either economic or evidentiary." 960 F.2d at 1033, 1043. Gillette asserts that it has suffered both business and litigation prejudice.

With regard to business prejudice, Gillette claims that it invested hundreds of millions of dollars into lubricating strip technology, manufacturing, and marketing. It alleges that it introduced several new products relying in meaningful measure on its belief that Wafer Shave had abandoned its claim.

■ In evaluating whether economic, or business, prejudice has occurred, courts must "look for a *change* in the economic position of the alleged infringer during the period of the delay." *Aukerman*, 960 F.2d at 1033. Change may be more easily found where the alleged infringer makes substantial new investment in allegedly infringing products

during the delay. *See Chubb Integrated Systems, Inc. v. National Bank of Washington*, 658 F.Supp. 1043, 1049 (D.D.C.1987) (defendant's substantial business investment supported finding of business prejudice); *Lemelson v. Carolina Enterprises, Inc.*, 541 F.Supp. 645, 657 (S.D.N.Y.1982) (defendant's investment in new product constituted "change of position" to support finding of prejudice); *Advanced Hydraulics*, 525 F.2d at 481 (expansion of business is evidence of detrimental reliance, prejudice); *Aukerman*, 960 F.2d at 1033 (noting that patentee may not "intentionally lie silent in wait watching damages escalate, ... particularly where an infringer, if he had had notice, could have switched to a noninfringing product.") (citations omitted).

■ During the period of delay in this case, the evidence clearly indicates that Gillette made substantial investment in razors which incorporated lubricating strips. *See* Gillette Facts 152–160. In particular, Gillette developed, manufactured, and marketed the SENSOR razor, which incorporates a lubricating strip. *See* Gillette Facts 160–164. Whether or not Gillette would have actually altered its business plans, it was clearly denied the opportunity to alter its business and investment strategies. *See Chubb*, 658 F.Supp. at 1049 (holding that even though alleged infringer believed that its products did not infringe, and therefore would not have changed its investment plans, infringer was prejudiced by not having opportunity to structure its business with the knowledge of a pending patent suit).

Even more importantly, for the purposes of the pending motion for summary judgment, as described earlier, Gillette lost the opportunity to limit its present exposure to substantial litigation costs and damages because it believed there was no longer a threat of litigation concerning the Jennings patent. More specifically, the opportunities to reach a settlement, file an early declaratory judgment action, or purchase the Jennings patent were no longer available when Wafer Shave filed suit in 1989. *See In re Yarn Process-*

---

5. The patentee also claimed that his delay in suing was due to his pursuit of other litigation. The *Aukerman* court held that since the defen-

dant did not know about the other litigation, it was irrelevant to the issue of estoppel. *Id.*

*ing,* 602 F.Supp. at 172 (recognizing lost opportunities to mitigate damages as prejudice); *Chubb,* 658 F.Supp. at 1049–50 (noting denial of "the certainty of an early determination" whether one's products infringe as evidence of prejudice).

Finally, the evidence does not place in dispute that Gillette suffered litigation prejudice in the form of lost evidence. In *Aukerman,* the court stated that:

> Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts.

960 F.2d at 1033; *see also A.C. Aukerman Co. v. Miller Formless Co., Inc.,* 693 F.2d 697, 701 (7th Cir.1982) (loss of witnesses' memory and lost documentation constitute prejudice). In this case, if Gillette had known that the patentee intended to pursue the patent infringement claim, it could have taken steps to preserve the testimony of important witnesses who died or became incapacitated during the delay period.

For example, Dr. Anthony Schwartz, who Gillette asserts, without dispute, was "intimately aware of the development of Gillette's shaving technology" and could have testified on the level of skill and art in the industry before the filing of the Jennings patent, has died. Gillette Fact 197; *see Advanced Hydraulics,* 525 F.2d at 481–82 (death of crucial witness is prejudice). Similarly, it is undisputed that Dr. Ben Alexander, the most senior Research and Development employee in Gillette's Boston laboratory has become incapacitated. He reviewed the 1979 submission of Jennings' product and could have testified as to the relationship between Jennings' product and the product that Gillette's lab in England had developed in 1977. Gillette Facts 198–202. In addition, Edgar Kent, a senior partner at Fish & Richardson, has died. Mr. Kent advised Gillette on whether Gillette was infringing the Jennings patent. His testimony would be relevant to whether Gillette was guilty of willful infringement. Gillette Fact 203; *see Studiengesellschaft Kohle m.b.H. v. Dart Industries, Inc.,* 862

F.2d 1564, 1574–75 (Fed.Cir.1988) (reliance on opinion of outside counsel relevant to determination of willful infringement).

In addition, the loss of key documents could have been prevented had Gillette known that those documents would be needed to defend Wafer Shave's claim. In particular, Gillette asserts, again without dispute, that during the period of the patentee's silence Gillette underwent a massive reorganization and, in the process, documents were lost. The patent abstracts sent from Boston to England, which could confirm that Gillette's England laboratory did not have access to the Jennings patent during the period when its lubricating strips were developed, are no longer available. Gillette Facts 204–05. If Gillette had been aware of the enduring threat that there would be litigation concerning the Jennings patent, it could have acted to preserve this evidence.

The foregoing undisputed facts establish that if Gillette had not believed that the patentee would not pursue the infringement claim, Gillette would have, at a minimum, re-evaluated its decision to develop and invest in its allegedly infringing product line, fully explored options to eliminate its exposure in this case, and had the opportunity to preserve relevant testimony and documents. A reasonable factfinder would have to find that Gillette suffered prejudice due to its lost opportunity to take these actions.

### 5. There is not evidence that Gillette engaged in egregious conduct.

 Gillette has satisfied all of the elements of equitable estoppel. It has demonstrated that: (1) the patentee threatened litigation then was silent for several years, misleading Gillette to reasonably believe that the patentee had abandoned the claim of infringement; (2) Gillette acted in reliance on its belief; and (3) Gillette was prejudiced as a result. However, the court must also consider whether there is evidence of egregious conduct by Gillette that would, if believed at trial, affect the balance of the equities and prevent a reasonable judge from deciding the estoppel issue in favor of Gillette. *See Aukerman,* 960 F.2d at 1033; *Bott v. Four Star Corp.,* 807 F.2d 1567, 1576 (Fed.Cir.1986); *TWM Manufacturing Co. v. Dura Corp.,* 592

F.2d 346, 349 (6th Cir.1979). " 'Proof of plagiarism will not favor defendant's claim of laches [or estoppel].' " *Bott*, 807 F.2d at 1576 (quoting *TWM*, 592 F.2d at 349). Gillette retains the burden of proof on this issue for its motion for summary judgment. *Aukerman*, 960 F.2d at 1044.

Wafer Shave alleges that Gillette is guilty of copying. It claims that when Jennings originally submitted his product for review in 1974, Gillette used it to develop Gillette's lubricating strip technology. However, the product Jennings submitted and the razors with lubricating strips Gillette now sells are markedly different. In addition to the fact that Jennings' product was intended to be separate from, rather than attached to, the razor, the methods of use of the two products are also different. Jennings' product was intended to be rubbed over the skin prior to shaving, and to serve as a substitute for shaving cream. Gillette's product passes over the skin directly *after* the blade, for post-shaving lubrication. Carver, the initial exclusive licensee, evidently recognized the distinction between the Jennings patent and Gillette's product, characterizing them as "complimentary [sic]," not in competition. Wafer Shave Exhibit 101. Furthermore, there is no evidence to support a finding that Gillette's employees in England, where the Gillette technology was developed, had access to Jennings' product, which was submitted to Gillette in Boston. Gillette Fact 10; Wafer Shave Exhibit 4. Wafer Shave has produced no direct evidence that any information about Jennings' submission was forwarded to England.[6] Rather, the Gillette employee who received the submission in Boston has testified that he did not send it or any information about it to England. Gillette Exhibit 83 ("Duval Dep.") at 73. The uncontroverted evidence indicates that the first point at which Gillette's employees in England were aware of the Jennings patent was in 1979, after the laboratory in England had already developed the product that was to become the lubricating strip, when Boston patent counsel sent a letter to England patent counsel informing him that England's invention did not infringe the Jennings patent. Gillette Exhibits 140, 163.

Wafer Shave also contends that Gillette willfully infringed its patent. Evidence that an alleged infringer was merely aware of a similar patented product does not alone, however, permit the inference of willful infringement; rather, such awareness creates a duty to "exercise due care to determine whether or not he is infringing." *Bott v. Four Star Corp.*, 807 F.2d at 1572. Gillette exercised due care by having its in-house patent attorneys review Jennings' submission at least twice and by seeking the opinion of outside counsel to ensure that Gillette's products did not infringe. Gillette Facts 241–48; *see Studiengesellschaft*, 862 F.2d at 1573–74 (reliance on outside counsel supports finding of no willful infringement).

Accordingly, the evidence provided does not permit the inference that Gillette copied or willfully infringed the Jennings patent. Rather, the a reasonable factfinder would necessarily find from the evidence that Gillette did not engage in such egregious conduct. Accordingly, Gillette is entitled to summary judgment on its estoppel defense.

### C. *Laches.*

Wafer Shave's claim is completely barred on the basis of equitable estoppel. Thus, it is not essential that Gillette's defense of laches, which would bar only the recovery of pre-filing damages, be addressed. In the interest of completeness, however, the court has evaluated the cross-motions for summary judgment concerning laches and concludes that Gillette is entitled to summary judgment on this issue as well.

As described earlier, in order to succeed on a defense of laches, an alleged infringer must show that the patentee was guilty of unreasonable and inexcusable delay, and that the alleged infringer suffered materially prejudice due to the delay. *Aukerman*, 960 F.2d at 1028. As indicated previously, there is not a genuine dispute on the question of whether Gillette was materially prejudiced

---

**6.** Both the Magistrate Judge and this court offered Wafer Shave the opportunity to take discovery in England. Wafer Shave declined. *See* Transcript of Hearing dated February 25, 1993 at 70–71.

by the delay in initiating this action. *See supra,* part II.B.5.

■ Although the parties disagree as to the precise length of the delay, they agree that it was less than six years. Therefore, the presumption of laches does not apply. *Aukerman,* 960 F.2d at 1028. Furthermore, those portions of the delay period during which negotiations were taking place should be excluded from the calculation as they are reasonable. *See Aukerman,* 960 F.2d at 1033 (citing *Baker Mfg. Co. v. Whitewater Mfg. Co.,* 430 F.2d 1008 (7th Cir.1970)); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1307 (Fed. Cir.1992) (negotiating with defendant and other parties for licenses reasonable). Thus, beginning with March, 1985 (when, Gillette contends, the patentee knew of Gillette's launching of ATRA PLUS), excluding April to November, 1985 (when the parties were corresponding about patent infringement) and May to July, 1986 (when the parties were corresponding about a purchase or license agreement), and concluding on March 31, 1989 (when Wafer Shave filed suit), the relevant period of delay is approximately three years.[7]

Wafer Shave contends that: (1) the delay was not long enough to be deemed unreasonable; and (2) the delay was excused due to Wafer Shave's inability to obtain adequate legal counsel. As the court in *Aukerman* held, "The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." 960 F.2d at 1032. Wafer Shave cites several cases in which courts have held that delays of less than six years were not unreasonable. *See Meyers v. Brooks Shoe, Inc.,* 912 F.2d 1459, 1462 (Fed.Cir.1990) (recognizing that in certain cases a finding of laches is appropriate where the delay is less than six years, but holding that in that case the equitable consideration of all of the facts did not warrant finding that a less than six-year delay was unreasonable); *Studiengesellschaft Kohle m.b.H. v. Dart Industries, Inc.,* 549 F.Supp. 716, 759 (D.Del.1982) (finding that three-year eight-month delay was a "relatively short period of time [and] was not unreasonable or inexcusable.").

■ However, the length of a delay in filing suit is not alone dispositive of the question of whether the delay was reasonable. The patentee's conduct also affects the reasonableness of the delay. *See Meyers v. Asics Corp.,* 974 F.2d at 1307. In *Meyers v. Asics,* the court held that a four-year delay was reasonable, because the patentee had not engaged in any conduct which would effect the balance of equities such as "expressly threaten[ing] litigation and then delay[ing] bringing suit for several years." *Id.* at 1307. The present case, however, is plainly distinguishable. Amernick threatened suit and the patentee's subsequent conduct and silence lulled Gillette into reasonably believing that the threat had been abandoned. The patentee's silence was especially unreasonable given its awareness of Gillette's massive marketing campaign of its allegedly infringing products. In the circumstances of this case, a reasonable factfinder would have to find that the delay in initiating suit was unreasonable.

■ Wafer Shave contends, however, that the delay was excused because it was diligently working to obtain counsel. In 1985, Amernick had agreed to take the case on a contingency fee, and Carver had agreed to pay Amernick's out of pocket costs, at least temporarily. Gillette Fact 175. However, in 1986, Carver terminated the license agreement. Gillette Fact 176. The patentee claims that during the period from 1986–1989, a diligent effort was made either to sell the patent, along with the right to sue Gillette, or to retain counsel that Mrs. Jennings could afford.

Courts have consistently and correctly held, however, that delays for lack of funds to hire an attorney, or to search for an attorney, are not excused for the purpose of determining laches. For example, in *Naxon*

---

7. This is not inconsistent with the use of a three-year and five-month period of delay for estoppel. The period used for estoppel does not exclude the second negotiation period because estoppel dates from the time of the threat of litigation, and continues so long as the patentee is silent with regard to the charge of infringement, and the reasonableness of the delay is not a factor of estoppel.

*Telesign Corp. v. Bunker Ramo Corp.,* 686 F.2d 1258, 1261 (7th Cir.1982), the court held that the fact that plaintiff had to search for attorney to take his case on contingency fee did not preclude a finding of laches, stating "[l]ack of funds ... is no excuse for delay in bringing suit." *See also Coleman v. Corning Glass Works,* 619 F.Supp. 950, 954 (W.D.N.Y. 1985), *aff'd,* 818 F.2d 874 (Fed.Cir.1987), (noting, "[The patentee] alleges that much of the delay was due to his inability to find an attorney to prosecute the action, or to raise the necessary funds. Those excuses are inadequate as a matter of law."); *cf. Aukerman,* 960 F.2d at 1033 (listing "possibly poverty ... under limited circumstances" as a recognized excuse).[8]

Even if the inability to retain counsel might conceivably bar an otherwise meritorious defense of laches in some cases, it does not do so here. In this case, Gillette reasonably responded to each of the patentee's communications. The patentee knew that Gillette was investing heavily in the production, advertising, and sales of products it now contends infringe the Jennings patent. It could have simply and inexpensively communicated to Gillette that it had not abandoned its infringement claim, but was having trouble finding counsel. If the patentee had communicated with Gillette in this fashion, Gillette could have exercised one or more of its many options to mitigate damages or avoid suit. In these circumstances, it would be grossly inequitable to permit Wafer Shave to recover pre-filing damages. Thus, a reasonable factfinder would necessarily find that Wafer Shave's delay in filing suit was not excusable, and that Gillette's laches defense is meritorious.

## III. CONCLUSION

When asked at oral argument, Wafer Shave's counsel could not identify any witness whose credibility would be important to the court's findings on estoppel and laches. *See* Transcript of Hearing dated February 25, 1993 at 67–68. The voluminous documentary evidence in this case, even when viewed in the light most favorable to Wafer Shave, demonstrates that Gillette is entitled to summary judgment. More specifically, the undisputed facts require the conclusion that Gillette has satisfied its burden of proving laches and estoppel, and there is no evidence of egregious conduct to affect the balance of the equities.

Accordingly, Gillette's motion for summary judgment on the grounds of estoppel and laches is hereby ALLOWED. Wafer Shave's cross motion for partial summary judgment is hereby DENIED.

8. The *Aukerman* court cites *Frank F. Smith Hardware Co. v. S. H. Pomeroy Co.,* 299 F. 544 (2d Cir.1924) for this proposition. In *Smith Hardware,* the court explained that "while poverty alone, no matter how real or extensive, is insufficient to excuse a delay in asserting a claim for infringement," in that case a combination of circumstances, including poverty, illness, the pursuit of other litigation to determine whether the patent at issue was indeed valid, and the nature and extent of the infringement, excused the delay in filing suit. *Id.* at 546–47.