**MELEA LIMITED, a Gibraltar corporation, and Plastic Molded Technologies, Inc., a Michigan corporation, Plaintiff,**

v.

**QUALITY MODELS LIMITED, a Michigan corporation, Defendant.**

No. CIV. 03–71338.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 12, 2004.

Robert C. Brandenburg, Ernie L. Brooks, Gordon S. Gold, Southfield, MI, for plaintiffs.

Marjory G. Basile, Detroit, MI, for defendant.

## OPINION AND ORDER

FEIKENS, Senior District Judge.

The underlying action in this case is a patent infringement dispute between the owner of a patent for gas-assisted injection molding and a manufacturer. After Plaintiffs filed suit and notified some of Defendant's customers of the alleged patent in-fringement, Defendant filed a counterclaim alleging tortious interference and unfair competition. Defendant filed a Motion to Dismiss or for Summary Judgment on Plaintiffs' Conversion, Unjust Enrichment and Patent Infringement claims. Plaintiffs opposed Defendant's motion. On July 30, 2003, this Court issued an opinion and order[1] addressing Defendant's motion.

After this Court issued that opinion and order, Plaintiff filed three motions. Defendant opposes all three motions.

First, Plaintiffs move, pursuant to Fed. R.Civ.P. 56, for summary judgment on count one (conversion) and count two (unjust enrichment).

Second, Plaintiffs move for partial summary judgment on (1) two of Defendant's affirmative defenses, No: 4 (common law fraud or misrepresentation); and 10 (implied and/or express license); and (2) count three of Defendant's counterclaim (estoppel).

Third, Plaintiffs move to dismiss count one (tortious interference with advantageous business relations) and count two (unfair competition in violation of 15 U.S.C. § 1125(a)) of Defendant's counterclaim, pursuant to Fed.R.Civ.P. 12(b)(6).

For the reasons below:

- the July 30, 2003, Opinion and Order *Melea Ltd. v. Quality Models Ltd.*, 274 F.Supp.2d 909 (E.D.Mich.2002) (order granting in part and dismissing in part Defendant's Motion for Dismissal and Summary Judgment), should be VACATED.

- Defendant's Motion to Dismiss and for Summary Judgment on Plaintiffs' Claims for Conversion and/or Unjust

---

1. *Melea Ltd. v. Quality Models Ltd,* opinion and order issued July 30, 2002 granting in part and dismissing in part Defendant's Mo-tion for Dismissal and Summary Judgment. No. 03–71338 (E.D.Mich. July 30, 2003).

Enrichment and/or Patent Infringement is GRANTED.

- the remainder of Plaintiffs' Motion for Summary Judgment on its own claims and on Defendant's counterclaims is therefore moot;

- Plaintiffs' Motion to Dismiss Counts One and Two of Defendant's Counterclaims is GRANTED.

## I. FACTUAL BACKGROUND

### A. The Parties

Plaintiff Melea Limited ("Melea") holds patents, including U.S. Patent No. 5,098,-637 ("the '637 patent"), covering certain GAIN molding processes used by suppliers to automotive and other manufacturers. (Pls.' Compl. at 3, ¶¶ 9–11.) The '637 patent protects a particular patented gas-assisted injection molding process ("GAIN Process"), entitled "Process For Injection Molding and Hollow Plastic Article Produced Thereby." *Id.* The '637 patent protection applies to the manufacturing which employs this particular GAIN process which is commonly used in the production of automotive parts. *Id.*

Plaintiff Plastic Molded Technologies, Inc. ("PMT"), based in Sterling Heights, Michigan, manufactures and sells goods, machinery, and equipment. (Pls.' Mot. for Summ. J. on Counts One and Two at 1.) As Melea's appointed independent representative, PMT manufactures and sells GAIN equipment. *Id.* PMT licenses the patented technology and also enforces Melea's patent rights. *Id.*

Defendant Quality Models Limited ("QML"), manufactures automotive parts for sale to automotive suppliers. (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at 2.) QML and PMT have conducted business together over the past nine years. (Pls.' Mot. for Summ. J. on Counts One and Two at Ex. A, Dec. Teasdale, ¶ 3.)

Richard Vandermuren conducted business as Vandermuren Manufacturing and Engineering ("VME"), and was engaged by PMT, through a Technical Representative Agreement, as a "technical representative." (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at Ex. 7.) Plaintiff PMT agreed with VME that VME would build, as an independent contractor, certain GAIN equipment. *Id.* Under the contract VME would also provide consultation services to PMT regarding PMT's engineering, licensing, service, and marketing matters. *Id.*

### B. The 1995 Sale

In 1995, Defendant QML purchased a "GAIN unit" from PMT. *Id.* at 2. A "GAIN unit...regulates and injects gas into a mold while a plastic product is being molded." *Id.* at 2, n. 1. "The gas pushes the liquid plastic against the sides of the mold, thereby producing a hollow plastic part." *Id.* QML dealt primarily with Steven VanHoeck ("VanHoeck"), then Sales Director for PMT. *Id.* at Ex. 2, Dec. VanHoeck, ¶ 1. William Szekesy ("Szekesy"), the President of QML, contends that QML "paid PMT in full" for the GAIN unit. *Id.* at Ex. 4, Dec. Szekesy, ¶ 2.

Plaintiffs allege that "PMT conditioned use of the GAIN unit on [QML's] signing of the[...]" Equipment Purchase Agreement ("EPA"). (Pls.' Mot. for Summ. J. on Counts One and Two at 10, n. 9.) Defendant claims that it understood that it had the right to use the GAIN unit without signing an EPA. (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at 2.) Defendant, citing VanHoeck, alleges "that by purchasing the unit, QML automatically was authorized to use all of Plaintiffs' proprietary processes, including

the process covered by the patent." *Id.* at 2, Ex. 2, ¶ 4.

Defendant alleges that "[a]fter QML purchased the GAIN Unit from PMT, representatives of PMT helped QML set up the GAIN unit, trained QML how to use the equipment, and trained QML how to practice the GAIN Process that Plaintiffs now assert QML is not authorized to use." *Id.* at 3. Additionally, "[o]ver the next several years, QML used the GAIN unit it had purchased from PMT," and "PMT serviced the unit and sold QML replacement parts." *Id.* at Ex. 4, Dec. Szekesy, ¶ 7. Furthermore, "PMT never suggested or alleged to QML that its use of the unit violated any patent owned by PMT or Melea Limited, or never informed QML that it had to execute an [EPA] in order to use the equipment." *Id.* at Ex. 4, Dec. Szekesy, ¶ 7.

In June of 1998, Defendant allegedly learned that PMT contacted one of its customers and accused that customer of infringing PMT's patents. *Id.* at 3. QML developed the parts at issue, NS Minivan Running Boards, "using the GAIN Unit it had purchased from PMT." *Id.* QML responded, on June 12, 1998, sending a letter to PMT asking to discuss the issue. *Id.* at Ex. 5, Letter of June 12, 1998. Szekesy "never received a response from PMT" and "therefore concluded that PMT was satisfied and considered the matter closed." *Id.* at. 4, Dec. Szekesy, ¶ 8.

## C. VME's Relationship With Plaintiff PMT

PMT agreed with VME that VME would build certain GAIN equipment. *Id.* at Ex. 7. PMT and VME also agreed that PMT would furnish VME with all the raw materials and components necessary to build the equipment. *Id.* Allegedly, this equipment included a "GAIN Gas Assist Unit" and a machine known as a "Nitrogen Control Unit." (Pls.' Mot. for Summ. J. on Counts One and Two at Ex. A, Dec. Teasdale, ¶ 5.) VME signed a confidentiality agreement and non-disclosure agreement that stated PMT would retain possession of all the material shared with VME, required VME to return all this material upon demand and precluded VME from disclosing the patented processes. *Id.* at Ex. C, Non–Disclosure Agreement.

## D. The 1998 Sale

In 1998, QML purchased "certain component parts for a gas assist unit and a prototype nitrogen generator from... [VME]." (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at 4.) Defendant asserts that QML knew VME was selling the parts as a result of a fee dispute between VME and PMT. *Id.* at 5.

Vandermuren claims that, "[d]uring the third quarter of 1998, a dispute arose concerning [PMT's] failure to pay outstanding amounts that it owed to VME." *Id.* at Ex. 6, Dec. Vandermuren, ¶ 5. On September 25, 1998, VME wrote to PMT requiring that PMT pay its outstanding debts to VME "...in full...by 5 PM Monday October 5, 1998," or VME "will dispose of any machines and components and credit your account with the amounts received." *Id.* at Ex. 14, Letter of Sept. 25, 1998.

PMT alleges that it "never fell behind on any of its...obligations to [VME]." (Pls.' Mot. for Summ. J. on Counts One and Two at 4.) On the contrary, Plaintiffs allege that PMT "overpaid [VME]...to keep [VME] from following through on his threat to sell GAIN equipment out of his inventory." *Id.* at 5. However, according to Vandermuren, PMT did not pay VME by the deadline. (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at Ex. 6, Dec. Vandermuren, at ¶ 9.) Therefore, VME sold the machines and components in its possession and credited PMT's account

with the amounts received. *Id.* at Ex. 6, Dec. Vandermuren, at ¶ 7–9. VME sold components to QML among others. *Id.* at ¶ 9.

According to Vandermuren, VME sold a prototype nitrogen generator as well as some components for a gas assist unit to QML. *Id.* at ¶ 11. However, Plaintiffs allege VME used PMT's materials "to fabricate a counterfeit GAIN unit" to sell to QML. (Pls.' Mot. for Summ. J. on Counts One and Two at 6.) Vandermuren testified that he told PMT it could take possession of the remaining assets in VME's possession after VME had sold enough of PMT's assets to satisfy PMT's obligations to VME. *Id.* at ¶ 10.

Plaintiffs allege that after QML purchased the GAIN equipment from VME, QML "concealed" the equipment "from PMT inside of its Ontario facility." (Pls.' Mot. for Summ. J. on Counts One and Two at 9.) However, Defendant claims that it never concealed the component purchase from Plaintiffs. (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at 6.) Defendant offers evidence that it asked Plaintiffs to come to its facility to service these components and PMT sold QML replacement parts for the equipment. *Id.* at Ex. 4, Dec. Szekesy, ¶ 12.

Plaintiffs allege that they "made numerous demands that [QML] return [the] equipment to PMT[...] but [QML] refused." (Pls.' Mot. for Summ. J. on Counts One and Two at 6.) Defendant disputes this contention. (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at 6.)

### E. Plaintiffs' Statements to Defendant QML's Customers

QML claims that PMT contacted two of QML's largest customers, Daimler Chrysler and Bombardier Recreational Produnts. (Def.'s Opp'n to Pls.' Mot. to Dis-

miss at 4.) On January 29, 2003, PMT contacted Daimler Chrysler by letter, and notified it of a "possible" infringement of Patent '637. *Id.* at 9, PMT Letter of Jan. 29, 2003. The letter does not name Defendant QML or any other entity. *Id.* On June 16, 2003, Plaintiffs sent a similar letter to Bombardier Recreational Products. *Id.* at Ex. 10. The letter to Bombardier also does not mention QML. *Id.*

### F. Procedural Background

On April 4, 2003, Plaintiffs filed a three-count Complaint against Defendant for patent infringement, conversion, and unjust enrichment. Plaintiffs' cause of action is based on facts related to two alleged sales of Plaintiffs' equipment to Defendant. Plaintiffs allege that in 1995 Defendant purchased a GAIN unit from PMT without obtaining the requisite license to use the equipment. (Pls.' Compl. ¶ 18.) Plaintiffs also allege that in 1998 Defendant purchased GAIN equipment from VME for less than its purchase price and without obtaining the requisite license to use the equipment. *Id.* at ¶¶ 17, 18.

On May 9, 2003, Defendant filed a Motion to Dismiss and for Summary Judgment. Defendant argued that Plaintiffs' claim for conversion was barred by a three year statute of limitations that allegedly began to accrue in 1998. (Def.'s Mot. to Dismiss and for Summ. J., May 9, 2003, ¶ 3.) QML argued that Plaintiffs' claim of unjust enrichment was barred by a three year statute of limitations that allegedly began to accrue in 1995 for the 1995 sale and 1998 for the VME sale. *Id.* at ¶ 4. QML claimed that Plaintiffs' claim of patent infringement was "without merit and should be dismissed as [Defendant] has an implied license with regard to any GAIN units or component parts that it acquired." *Id.* at ¶ 5. Defendant also argued that estoppel should bar Plaintiffs' infringement

claim because Plaintiffs did not object to Defendant's 1995 equipment purchase and alleged unlicensed use until 1999. (Def.'s Reply Br. in Supp. of Mot. to Dismiss and for Summ. J. at 5.)

On July 30, 2003, I issued an opinion granting in part and denying in part Defendant's Motion to Dismiss and for Summary Judgment. I held: (1) Defendant's motion against Plaintiffs' conversion claim "is granted as to the 1995 sale, but denied as to the [VME] sale"; (2) Defendant's motion against Plaintiffs' unjust enrichment claim "is granted as to the 1995 sale, but denied as to the [VME] sale"; and (3) Defendant's motion against Plaintiffs' patent infringement claim "is denied." *Melea Limited v. Quality Models Limited,* 274 F.Supp.2d 909 (E.D.Mich.2002). I did not grant summary judgment as to all of Defendant's claims because "a genuine issue of material facts exists as to whether an oral license was given to defendant during the 1995 sale and whether defendant has a valid estoppel defense."[2] *Id.* at 7. Thus, the opinion left intact Plaintiffs' claims of conversion and unjust enrichment as to the 1998 VME sale, and left intact Plaintiffs' patent infringement claim (as to both sales).

On August 11, 2003, QML filed an Answer, Affirmative Defenses, and Counterclaim. Defendant listed 14 affirmative defenses, including No. 4, "Plaintiffs' claims fail due to Plaintiffs' acts of fraud or misrepresentation," and No. 10, "Plaintiffs' claims are barred because QML has implied and/or express licenses of use." (Def.'s Answer at 5–6.) Defendant also brought the following three counterclaims: (1) tortious interference with advantageous business relations; (2) unfair competition,

pursuant to 15 U.S.C. § 1125(a); and (3) estoppel. *Id.* at 9–12.

On April 7, 2004, Plaintiffs filed the instant Motion for Summary Judgment on Count One of the Complaint, for Common Law and Statutory Conversion, and Count Two of the Complaint, for Unjust Enrichment. (Pls.' Mot. for Summ. J. on Counts One and Two at 1.) On April 7, 2004, Plaintiffs also filed the instant Motion for Partial Summary Judgment on (A) Defendant's Affirmative Defenses No. 4 and 10, and (B) Count Three of the Counterclaim (estoppel). (Pls.' Mot. for Partial Summ. J. at 1.) On April 9, Plaintiffs filed the instant Motion to Dismiss Counts One and Two of the Counterclaim. (Pls.' Mot. to Dismiss at 1.)

## II. ANALYSIS

Plaintiffs bring claims of conversion and unjust enrichment against Defendant deriving from Defendant's alleged lack of title. Plaintiffs also bring a claim of patent infringement against Defendant deriving from Defendant's lack of a license to use the '637 patent. Plaintiffs' claims survive because my July 30, 2003 Opinion and Order did not fully dispose of those claims. After further consideration, I find that parts of the opinion's foundation are untenable. Therefore, I vacate my opinion and order of July 30, 2003, in its entirety.

I now hold that Plaintiffs granted Defendant an implied license to use the patented '637 process. Additionally, I find that when Plaintiffs granted an implied license to Defendant to use the '637 patented process, Plaintiffs implicitly acquiesced to Defendant's possession of the GAIN equipment. Defendant, therefore, properly possesses the equipment and retains valid title to both the equipment pur-

---

**2.** Furthermore, I stated that Plaintiffs should be afforded an opportunity to depose Van-Hoeck and respond to the statements in the

VanHoeck affidavit that support defendant's claim. *Melea Limited v. Quality Models Limited,* 274 F.Supp.2d 909 (E.D.Mich.2002).

chased under the 1995 sale and the 1998 sale. Thus, Plaintiffs may not bring conversion or unjust enrichment claims against Defendant based on lack of title because Defendant has proper title to the equipment. Furthermore, Plaintiffs may not bring a patent infringement claim based on a lack of a license to use Plaintiffs' patented process because Plaintiffs granted Defendant an implied license to use the '637 patent.

Because I find that Defendant prevails on its Motion to Dismiss and for Summary Judgment on Plaintiffs' Claims, two of Plaintiffs' motions are moot (these moot claims are Plaintiffs' Motion for Summary Judgment on Plaintiffs' Claims; and Motion for Partial Summary Judgment on (1) Defendant's Affirmative Defenses No. 4 and 10, and (2) Count Three of Defendant's Counterclaim).

### A. Motion for Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the evidence and any inferences drawn from the evidence in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted), *Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir.2001).

The burden on the moving party is satisfied where there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In order for a claim to survive a motion for summary judgment, the respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has some discretion to determine whether the respondent's claim is plausible. *Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989).

### B. Implied License

When a patent owner does not expressly authorize the use of a patented process but sells a component designed to carry out the process an implied license to use the process may arise. *See Carborundum Co. v. Molten Metal Equip. Innovations, Inc.,* 72 F.3d 872, 878 (Fed.Cir.1995); *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995) (finding that in some situations the "course of conduct between a patent...owner and an accused infringer may create an implied license...."); *Hewlett–Packard Co. v. Repeat–O–Type Stencil Mfg. Corp., Inc.,* 123 F.3d 1445, 1455 (Fed.Cir.1997), *cert. denied,* 523 U.S. 1022, 118 S.Ct. 1304, 140 L.Ed.2d 470 (1998) (a patent owner who sells equipment without a condition "parts with the right to enforce any patent that the parties might reasonably have contemplated would interfere with the use of the purchased device.") The Supreme Court stated that a patent owner need not formally grant a license to a user to give a license effect. *De Forest Radio and Tel. & Tel. Co. v. U.S.,* 273 U.S. 236, 241, 47 S.Ct. 366, 71 L.Ed. 625 (1927). A patent

owner may grant an implied license to another person through language or conduct "from which that other [person] may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts...." *Id.*

■ According to the Federal Circuit, an implied license may arise where a patent owner has sold nonpatented equipment used to practice a patented invention if two requirements have been met. First, the equipment must have no noninfringing uses. *Met–Coil Systems Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 686 (Fed. Cir.1986). "Second, the circumstances of the sale must 'plainly indicate that the grant of a license should be inferred.'" *Id.*

■ The accused infringer bears the burden of proving that the patent owner granted an implied license to the accused infringer. *Carborundum Co.,* 72 F.3d 872, 878.

## C. *Implied License by Equitable Estoppel*

■ An equitable estoppel may give rise to an implied license. *Zapata Indus. Inc. v. W.R. Grace & Co.-Conn.,* 51 U.S.P.Q.2d 1619, 1625 (S.D.Fla.1999) ("An implied license can be created pursuant to several different legal theories, including acquiescence, by conduct, by equitable estoppel."); *see also McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917 (Fed.Cir.1995). For estoppel to prevent a patent owner

from denying that his conduct granted an implied license to a defendant, alleged to be an infringer, the defendant must prove three elements. The three elements are: (1) the patent owner's misleading conduct "leads the alleged infringer to reasonably infer that the patentee does not intend to enforce his patent..."; (2) "the alleged infringer relies on" the patent owner's conduct; and (3) because the alleged infringer has relied on the patent owner's conduct "the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *Ecolab, Inc. v. Envirochem, Inc.,* 264 F.3d 1358, 1371 (Fed.Cir.2001).

### 1. *PMT's Misleading Conduct*

■ The first element requires that the patent owner exhibit misleading conduct from which the alleged infringer reasonably infers that the patent owner does not intend to enforce his patent. *Ecolab, Inc.,* 264 F.3d 1358, 1371. PMT did demonstrate conduct from which QML could reasonably infer that PMT did not intend to enforce the '637 patent. PMT represented that by purchasing the GAIN equipment QML automatically was authorized to use all of Plaintiffs' patented process. (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at 2, Ex. 2, ¶ 4.) VanHoeck testified that at that time of the 1995 purchase, he "...informed [QML] that by purchasing the equipment they automatically were granted a right to use all GAIN processes."[3] *Id.* at Ex. 2 ¶ 2. Additionally, PMT's representatives helped "QML

---

**3.** Plaintiffs now request that this Court strike VanHoek's Declaration. (Notice of Pls.' Objections to July 7, 2003, Decl. at 3.) Plaintiffs claim that Defendant, in its reply brief, improperly raised this declaration as new evidence. *Id.* Plaintiffs make their request based on their claim that they have had no opportunity to file a surreply brief to respond to this new evidence. *Id.* This Court may permit the parties to file additional documents in sup-

port or opposition to motion, however, Plaintiffs did not make a motion to file additional documents. E.D.Mich. LR 7.1(f). Plaintiffs, moreover, had an opportunity to respond to this declaration at the July 24, 2003, hearing held on QML's Motion to Dismiss and for Summary Judgment. Thus, I DENY Plaintiffs' request to strike VanHoeck's Declaration.

set up the GAIN unit, trained QML how to use the equipment, and trained QML how to practice the GAIN Process that Plaintiffs now assert QML is not authorized to use." *Id.* at 3.

Furthermore, "[o]ver the next several years, QML used the GAIN unit it had purchased from PMT," and "PMT serviced the unit and sold QML replacement parts." *Id.* at Ex. 4, Dec. Szekesy, ¶ 7. "PMT never suggested or alleged to QML that its use of the unit violated any patent owned by PMT or Melea Limited, or never informed QML that it had to execute an [EPA] to are the equipment." *Id.* at Ex. 4, Dec. Szekesy, ¶ 7.

Plaintiffs contend that VanHoeck's letter (dated December 4, 1995) demonstrater that PMT did request that QML sign and deliver an EPA to PMT. (Pls.' Mot. for Summ. J. on Counts One and Two at 7.) However, this letter clearly does not request that QML either sign or return the EPA to PMT, nor, I believe, is that a reasonable inference that can be made from the text of the letter. *Id.* at Ex. N. Plaintiffs also provide Ladney's testimony to support their contention. *Id.* at 7. However, Ladney's Declaration does not lend any more support to Plaintiffs' argument than VanHoeck's letter. Ladney states that PMT notified QML to execute an EPA as a condition for practicing Melea's patents. *Id.* at Ex. M, ¶ 8. However, Ladney bases this statement on VanHoeck's December 4, 1995, letter to PMT. *Id.* at Ex. M, ¶ 10. Therefore, I find that Plaintiffs do not provide any evidence that Plaintiffs told QML that it was required to execute an EPA as a condition of practicing the Melea patents.

In June of 1998, QML allegedly learned that PMT contacted one of QML's custom-

ers and accused that customer of infringing PMT's patents. *Id.* at 3. On June 12, 1998, QML sent a letter to PMT asking to discuss the issue. *Id.* at Ex. 5, Letter of June 12, 1998. Szekesy "never received a response from PMT" and "therefore concluded that PMT was satisfied and considered the matter closed." *Id.* at. 4, Dec. Szekesy, ¶ 8.

The Federal Circuit stated that mere silence will not create an estoppel. *Hemstreet v. Computer Entry Sys. Corp.,* 972 F.2d 1290, 1294–95 n. 5 (Fed.Cir.1992) ("… mere silence must be accompanied by some *other* factor which indicates that the silence was sufficiently misleading as to amount to bad faith….") (emphasis in the original). However, Plaintiffs delayed bringing their claim against Defendant for more than eight years.[4]

■ A plaintiff's silence will not create an estoppel unless a plaintiff has a clear duty to speak or unless continued silence will reinforce "the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." *A.C. Aukerman Co.,* 960 F.2d at 1043. However, where a plaintiff's inaction is combined with other facts respecting the relationship between the parties, it may give rise to the necessary inference that the claim against a defendant is abandoned. *A.C. Aukerman Co.,* 960 F.2d at 1042. *See Scholle Corp. v. Blackhawk Molding Co.,* 133 F.3d 1469, 1473 (Fed.Cir. 1998) (finding that "…there is not reason why equitable estoppel could not arise in three-and-a-half years or even sooner.") Based on Plaintiffs' delay to enforce their patent, along with their misleading conduct, Defendant could reasonably conclude that Plaintiffs abandoned their claim.

---

**4.** Defendant purchased the GAIN equipment from Plaintiffs in 1995 and Plaintiffs did not file their complaint until 2003.

Plaintiffs do not provide any evidence that refutes these facts. Therefore, viewing the evidence in a light most favorable to the Plaintiffs, I find that Plaintiffs demonstrated misleading conduct from which Defendant could infer that Plaintiffs did not intend to enforce its patent. This conduct includes: Plaintiffs' eight year delay in bringing its claim, Plaintiffs' failure to respond to Defendant's letter (dated June 12, 1998), Plaintiffs' technical service, training and provision of replacement components and VanHoeck's statement regarding PMT's grant of an automatic license to QML.

### 2. *QML's Reliance*

■ The second equitable estoppel element requires Defendant demonstrate that it relied on the patent owner's conduct. *Ecolab, Inc.,* 264 F.3d 1358, 1371. In *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* the court explained that reliance occurs when one is "led to take action by the conduct of the other party." 750 F.2d 903, 925 (Fed.Cir.1984); citing *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1559 (Fed.Cir. 1983) (citations omitted); *see also Radio Corp. of Am. v. Andrea,* 90 F.2d 612, 615 (2d Cir.1937). The element of reliance requires that the accused infringer show that it "had a relationship or a communication with the plaintiff which lulls the [alleged] infringer into a sense of security in going ahead" with a particular action. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1022 (N.D.Calif.1993); *see also Wafer Shave Inc. v. The Gillette Co.,* 29 U.S.P.Q.2d 1419, 1426–27 (D.Mass.1993) (sustaining an estoppel defense where Gillete reasonably relied on the patentee's misleading silence; despite evidence that Gillete's decision to introduce new product lines was not affected by the patentee's silence Gillete "would have at least reviewed the patent infringement claim more carefully, and reviewed its business plans in light of that claim.")

QML presents evidence of reliance on PMT's conduct. VanHoeck told QML that PMT granted QML an automatic license to use the patented process. (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at 2, Ex. 2, ¶ 4.) QML relied on the statement of PMT's sales director and did not sign the EPA. *Id.* at 2. Furthermore, QML sent a letter (dated June 12, 1998) to PMT asking to discuss potential patent infringement. (Def.'s Opp'n to Pls.' Mot. for Summ. J. on Counts One and Two at Ex. 5, Letter of June 12, 1998.) PMT never responded to this letter. *Id.* at 4, Dec. Szekesy, ¶ 8.

This situation is similar to *Wafer Shave v. The Gillette Co.,* in that case the defendant, alleged to be an infringer, dismantled its legal efforts concerning the patent at issue when the patent owner failed to respond to the defendant's suggestion of a non-exclusive license. 29 U.S.P.Q.2d 1419, 1426–27. The defendant in *Wafer Shave* claimed that it relied on the patent owner's actions because the defendant did not purchase the patent to mitigate its damages and eliminate its exposure. *Id.* That court found that these factors among others were sufficient to find that the defendant reasonably relied on the patent owner's misleading silence. *Id.*

QML's argument for reliance upon PMT's conduct is similar but not as strong as the alleged infringer's case in *Wafer Shave.* In contrast to QML, the defendant in *Wafer Shave Inc.* provided more proof that it relied on patent owner's conduct and therefore that defendant presented a stronger case of reliance than Defendant.[5]

---

5. The infringer in *Wafer Shave* proffered evidence that it "would have at least reviewed the patent infringement claim more carefully, and reviewed its business plans in light of that

However, that court did not require that defendant to provide an extensive showing of reliance, nor did that court state that any separate incident of reliance was insufficient to establish the reliance element.

QML provided reliance evidence similar to that which the accused infringer produced in *Wafer Shave*. Given this uncontroverted evidence of QML's reliance, I find that as a matter of law that QML sufficiently demonstrates that it relied on PMT's conduct.

### 3. Material Prejudice

To prove an implied license by equitable estoppel a defendant must also demonstrate that there was prejudice to the defendant. *A.C. Aukerman Co.*, 960 F.2d 1020. A defendant, alleged to be an infringer, must show prejudice in a change of economic position or a loss of evidence. *Id.* at 1041; *see Hall v. Aqua Queen Mfg. Inc.*, 93 F.3d 1548 (Fed.Cir.1996) (finding no prejudice because the defendant did not "demonstrate that the allegedly prejudicial events occurred after [the patentee] knew or should have known of the allegedly infringing activities."); *ABB Robotics Inc. v. GMFanuc Robotics*, 52 F.3d 1062, 1065 (Fed.Cir.1995). And such a defendant, alleged to be an infringer, does not need to show capital investments to prove economic prejudice. *Id.* Courts that did not find economic prejudice reached their conclusions because the alleged infringer did not prove that its increased expenditures (e.g. marketing and development costs) were related to the patent owner's actions. *Id.* A court should inquire whether the accused infringer has changed its economic position during the period of the patent owner's delay. *Id.*

QML presents some evidence regarding material prejudice. QML claims that "but for Plaintiff's representations...QML could have taken measures to protect itself." (Def.'s Opp'n to Pl.s' Mot. for Partial Summ. J. at 18.) QML explains that it continued to do business with PMT after QML purchased the GAIN unit in 1995, and if QML knew that PMT would assert patent infringement QML would "have mitigated the expenses that it is now incurring." *Id.* Plaintiffs do not dispute Defendant's claim that Defendant was materially prejudiced due to Defendant's reliance on Plaintiffs' conduct.

I believe that QML presents a showing of prejudice relating to a change of economic position as required by *A.C. Aukerman Co.*, but QML's presentation is not very strong.[6] 960 F.2d 1020. Defendant

claim."; "More directly, the fact that Gillette failed to take affirmative actions to protect itself from a lawsuit seeking many millions of dollars in damages, such as the one it is facing now, is evidence of its reliance. After [the patentee] failed to respond to the suggestion of a non-exclusive license, Gillette dismantled its legal efforts concerning the...patent. It also did not try to mitigate possible damages by effecting a quick settlement or initiating a declaratory judgment action.... Gillette had the opportunity...to...buy the patent for a mere $330,000 in order to eliminate its exposure to being required to incur substantial legal fees and to being held liable for substantial damages in an infringement suit. Gillette's assertion that it would have acted to limit its possible exposure...is fully supported by the fact that when [another party] raised similar patent claims in the same period and persistently pursued them, Gillette filed a declaratory judgment action. Finally...Gillette did not preserve...evidence necessary for the litigation...." *Wafer Shave Inc.*, 29 U.S.P.Q.2d at 1426–27.

6. Although QML did not present a strong claim of material prejudice, I believe, however, that there are other factors weighing in QML's favor which QML did not clearly state in its brief. First, I believe that QML must have incurred some marketing and development costs regarding products that were manufactured with the patented process. These costs would not have been incurred had QML been aware that it was not licensed to use the

does not articulate the element of material prejudice as defined by the courts in *Hall* and *ABB Robotics Inc.*, Furthermore, Defendant does not state that prejudicial events occurred after PMT knew of QML's infringement. *See Hall*, 93 F.3d 1548. Defendant also does not claim that increased expenditures were related to PMT's actions, or that Defendant changed its economic position during PMT's delay. *See ABB Robotics Inc.*, 52 F.3d 1062. However, Defendant does demonstrate sufficient unrefuted evidence of material prejudice.

QML provides uncontroverted evidence to support the three elements of an implied license by equitable estoppel. First, QML provides evidence that PMT exhibited misleading conduct from which QML reasonably inferred that PMT and Melea did not intend to enforce the patent. Second, QML provides evidence of reliance upon PMT's misleading conduct. Finally, sufficient evidence appears to be present to support a finding that QML's reliance on PMT's conduct materially prejudiced QML. Thus, I find that PMT granted an implied license by equitable estoppel to QML when it sold a GAIN unit to PMT in 1995.

### D. Plaintiff's Motion to Dismiss Count One of Defendant's Counterclaim (Tortious Interference with a Business Relationship)

Defendant alleges tortious interference with business relations in Count I of its Counterclaim. (Def.'s Answer at ¶ 22–23.) Specifically, Defendant reasons that this claim arises from Plaintiffs' contact with Defendant's "customers and potential customers and falsely stating that certain automotive supplies provided by QML infringe [Plaintiffs'] patents." *Id.* Defendant also alleges that as a result of Plaintiffs' "wrongful acts," "QML has suffered damages and has suffered and will continue to suffer injury and harm." *Id.* at ¶ 25. Defendant bases count one of its counterclaim on two of PMT's letters. PMT sent one letter to Daimler Chrysler and another to Bombardier. (Def.'s Opp'n to Pls.' Mot. to Dismiss at Ex. 9 and 10.)

### 1. Standard for a Motion to Dismiss

A claim may be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for "failure to state a claim upon which relief can be granted." On such a motion to dismiss, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). In this case, matters outside the pleadings have been presented and not excluded by this Court. The record includes a copy of Plaintiffs' letters and an affidavit by Michael Stone, the General Counsel of Eastman Outdoors, Inc. discussing Plaintiffs' letters. Thus, Plaintiffs' Motion to Dismiss should be treated as a Motion for Summary Judgment.

### 2. Analysis of Plaintiff's Motion to Dismiss Count I of Defendant's Counterclaim

Under Michigan law, the elements of tortious interference with a business

---

patented process. Second, QML hired PMT to service the GAIN unit, QML purchased GAIN replacement parts from PMT and QML purchased GAIN components from VME. *Id.* at 4, 15. QML incurred these expenditures after PMT should have known of PMT's infringement because of PMT's visits to QML's facility. Additionally, QML possibly would not have incurred these expenses related to its GAIN unit had it known that it would not have been permitted to use the GAIN unit to produce goods using the patented process. Therefore, these other factors provide additional evidence that demonstrates that QML suffered material prejudice from its reliance on the PMT's conduct.

relationship are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the plaintiff. *BPS Clinical Lab. v. Blue Cross and Blue Shield of Michigan,* 217 Mich.App. 687, 552 N.W.2d 919, 924–25 (Mich.App.1996).

■ The Federal Circuit has "held that federal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.,* 362 F.3d 1367, 1374 (Fed.Cir.2004); citing *Zenith Elec. Corp. v. Exzec. Inc.,* 182 F.3d 1340, 1355 (Fed.Cir.1999). State law claims "can survive federal preemption only to the extent that those claims are based on a showing of 'bad faith' action in asserting infringement." *Id.* "Bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." *Zenith,* 182 F.3d at 1355.

A defendant must show that a patentee's assertions of infringement were "objectively baseless" to demonstrate "bad faith." *Globetrotter Software. Inc.,* 362 F.3d at 1375–76. A claim is "objectively baseless" if "no reasonable litigant could realistically expect success on the merits." *Id.* citing *Prof'l. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 57, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). "In general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights." *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 897 (Fed.Cir.1998);

quoted in *Golan v. Pingel Enter.,* 310 F.3d 1360, 1371 (6th Cir.2002).

■ In this case, Defendant has not identified a single false statement in Plaintiffs' letters. Defendant alleges that Plaintiffs "falsely stat[ed] that certain automotive supplies provided by QML infringe [Plaintiffs'] patents." (Def.'s Answer at ¶ 22.) However, in Plaintiffs' letter to Daimler Chrysler, Plaintiffs did not assert that QML's parts infringed Plaintiffs' patent. Plaintiffs asserted only that it had recently come to its attention that "Daimler Chrysler has several automotive components which appear to exhibit characteristics consistent" with Plaintiffs' patent. (Def.'s Opp'n to Pls.'. Mot. to Dismiss at Ex. 9, Pls.' letter of Jan. 29, 2003.) Defendant offers no evidence that this, or any other statement contained in Plaintiffs' letter, is untrue.

In the letter to Bombardier, Plaintiffs explain in detail how the features of one of Bombardier's parts evidences a *"prima facie* case of patent infringement of claim 1" of Plaintiffs' patent. *Id.* at Ex. 10, Pls.' letter of June 16, 2003. There is no evidence that the Bombardier part did not fall within "Claim 1 of the '637 patent." Defendant also offers no evidence that any other statement contained in Plaintiffs' letter is untrue.

■ Defendant also alleges that Plaintiffs "have defamed QML." (Def's Answer at ¶ 23.) However, there is no merit in Defendant's defamation claim, because Plaintiffs' letters do not reference QML, and do not contain false statements.

Defendant argues that Plaintiffs demonstrates "bad faith" because Plaintiffs allegedly "were aware that QML had a license" to make the parts that it sold to Daimler Chrysler and Bombardier. (Def.'s Opp'n to Pls.' Mot. to Dismiss at 4.) Defendant argues that Plaintiffs sent the letters "de-

spite their knowledge that there could be no infringement by virtue of Plaintiffs having granted QML a license to practice the patented process." *Id.* at 11.

However, there is no evidence that before sending out the letters Plaintiffs were aware of Defendant's involvement with the customers because the letters do not reference Defendant or Defendant's GAIN unit. Furthermore, Defendant can not demonstrate "bad faith" because it has not proven that Plaintiffs "knew" there was no infringement when it sent the letters. Defendant has not provided affirmative evidence of bad faith. Therefore, Defendant's state law Counterclaim for Tortious Interference with Business Relations must be preempted by federal law.

### 3. *Noerr–Pennington Doctrine*

▆ Alternatively, the *Noerr–Pennington* doctrine also bars Defendant's counterclaim. The First Amendment of the United States Constitution provides that people have a right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The *Noerr–Pennington* doctrine, based on the right to seek redress in the courts, provides that a party "may not be subjected to liability for its attempt to have its rights protected by the courts unless that attempt is shown to have been a mere 'sham.'" *Pennwalt Corp. v. Zenith Lab., Inc.*, 472 F.Supp. 413, 424 (E.D.Mich.1979); citing *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

▆ The Michigan Court of Appeals stated that the *Noerr–Pennington* doctrine "bars litigation arising from injuries received as a consequence of the First Amendment petitioning activity, regardless of the underlying cause of action asserted by the plaintiffs."[7] *Azzar v. Primebank,* 198 Mich.App. 512, 517, 499 N.W.2d 793 (Mich.Ct.App.1993). Additionally, that Court further interpreted the *Noerr–Pennington* doctrine to protect a defendant from claims arising from a threat to file a lawsuit. *Pennwalt Corp. v. Zenith Lab.,* 472 F.Supp. 413, 424. In light of *Pennwalt Corp.,* Plaintiffs are immune from liability because the Plaintiffs' letters proposed a potential lawsuit to Defendant's customers. Therefore, the *Noerr–Pennington* doctrine bars Defendant's counterclaim for tortious interference with a business relationship arising from Plaintiffs' letters to Defendant's customers.

The Supreme Court created a narrow "sham" exception to the *Noerr–Pennington* doctrine. *Eaton v. Newport Bd. of Educ.,* 975 F.2d 292, 298 (1992); citing *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 379–84, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). The "sham" exception to the *Noerr–Pennington* doctrine applies where a plaintiff files a groundless lawsuit "to harass and injure" a defendant. *Pennwalt Corp.,* 472 F.Supp. at 424. Plaintiffs' letters do not demonstrate that the allegation of a possible infringement claim was a mere "sham." Furthermore, Defendant does not provide evidence that Plaintiffs sent letters to Defendant's customers for an improper purpose. Therefore, Plaintiffs' actions do not

---

**7.** I raise the *Noerr–Pennington* doctrine only as an alternative reason to dismiss Defendant's counterclaim because I recognize that circuits appear to be split over whether to recognize the doctrine as a defense to a lawsuit, *see Theofel v. Farey–Jones,* 359 F.3d 1066, 1078 (9th Cir.2004), or whether the doctrine provides a party with immunity from a lawsuit. *Freedom Holdings. Inc. v. Spitzer,* 357 F.3d 205, 233 (2d Cir.2004); *see also Pennwalt Corp. v. Zenith Lab., Inc.,* 472 F.Supp. 413, 424 (E.D.Mich.1979). I believe that *Pennwalt Corp.* correctly finds that a party is immune from liability.

fall within the exception to the "sham" exception to the *Noerr–Pennington* doctrine.

Defendant's state law Counterclaim for Tortious Interference with Business Relations is preempted by federal law. Furthermore, the *Noerr–Pennington* doctrine also bars Defendant from bringing this counterclaim. Thus, I GRANT Plaintiffs motion to dismiss Count One of Defendant's counterclaim.

### E. Plaintiff's Motion to Dismiss Count Two of Defendant's Counterclaim (Federal Unfair Competition)

Defendant alleges a claim of federal Unfair Competition in Count Two of its Counterclaim. Specifically, Defendant reasons that this claim arises from PMT's contact with "QML's customers and potential customers, and falsely stated that certain products manufactured by QML could not be manufactured in a way that did not infringe [Plaintiffs'] purported patents, and that QML is infringing [Plaintiffs'] patents." (Def.'s Answer at ¶ 27.) QML contends that PMT falsely stated to these customers that "QML does not have a right to use the GAIN unit or to practice the GAIN processes." *Id.* at ¶ 28. QML claims that PMT made these statements "in a bad faith attempt to injure QML's reputation in the marketplace." *Id.* at ¶ 29. QML claims that Plaintiffs' "representations were false, made in bad faith, and intended to create confusion, mistake and deception among customers in the trade and to divert customers of QML and were made willfully by [Plaintiffs] with the intent to deceive." *Id.* at ¶ 30. Defendant also alleges that as a result of Plaintiffs' "false statements," "QML has suffered damages and will continue to suffer injury and harm." *Id.* at ¶ 32.

Count two of Defendant's counterclaim also arises solely from the January 29, 2003, and June 16, 2003, letters that Plaintiffs sent to Daimler Chrysler and Bombardier. (Def.'s Opp'n to Pls.' Mot. to Dismiss at Ex 9 and 10.)

The basis for Defendants' Counterclaim for Unfair Competition is § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Section 43(a) provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Section 43(a) serves as the basis for claims generally known as "false advertising," "trade libel," and "product disparagement." *Zenith Elec Corp. v. Exzec. Inc.*, 182 F.3d 1340, 1347–48 (Fed.Cir.1999); citing 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:10, at 27–19 to 27–20 (4th ed. 1998).

To prevail on a claim under § 43(a), a plaintiff must establish that: (1) the defendant has made a false or misleading statement of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the statement was introduced into interstate commerce; and (5) there is some causal link between the challenged state-

ment and harm to the plaintiff. *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001); *Zenith*, 182 F.3d at 1348. A statement may be "misleading" if it is "literally true, yet deceptive." *Herman Miller*, 270 F.3d at 323. Statements of opinion are not actionable. *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 615 (6th Cir.1999).

■ Marketplace representations of patent infringement may form the basis of a claim under § 43(a), but only if such marketplace representations were made in "bad faith." *Zenith*, 182 F.3d at 1353 ("before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith.") *See also Golan*, 310 F.3d at 1371 ("patentees do not violate the rules of fair competition by making accurate representations, and are allowed to be inaccurate provided they make them in good faith.") The requirement of "bad faith" "is in addition to the elements required by § 43(a) itself, as § 43(a) alone does not require bad faith." *Zenith*, 182 F.3d at 1353 (citations omitted).

■ The law "recognizes a presumption that the assertion of a duly granted patent is made in good faith." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 999 (Fed.Cir.2003); quoting *Golan*, 310 F.3d at 1371. In light of the presumption of good faith, the Federal Circuit has held that "[t]o avoid summary judgment, a party claiming bad faith patent enforcement 'must present affirma-

tive evidence sufficient for a reasonable jury to conclude that the patentee acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial.'" *Id.* Therefore, in the present case, Defendants must present "affirmative evidence" that Plaintiffs acted in "bad faith" when Plaintiffs sent out the letters regarding their patent to Daimler Chrysler and Bombardier.

As discussed above, Defendant has not identified false or misleading statement contained in Plaintiffs' letters. Nor has Defendant provided affirmative evidence that Plaintiffs sent out their letters in "bad faith." Defendant has failed to raise any issue of material fact as to its unfair competition counterclaim.

■ Additionally, I find, in the alternative, that the *Noerr–Pennington* doctrine bars this counterclaim. (*See supra* Section II.D.3.) As stated above, Plaintiffs are immune from liability because the Plaintiffs' letters proposed a potential lawsuit. *Id.* Therefore, the *Noerr–Pennington* doctrine bars Defendant's counterclaim for unfair competition arising from Plaintiffs' letters to Defendant's customers. Thus I GRANT Plaintiffs Motion to Dismiss Count Two of Defendant's Counterclaim.

### III. CONCLUSION

I VACATE my previous opinion and order[8] issued July 30, 2003, and I find that Defendant is able to demonstrate that Plaintiffs granted Defendant an implied license by equitable estoppel to use the patented process and possess the GAIN equipment and/or components. Furthermore, I GRANT Defendant's original Motion to Dismiss or for Summary Judgment on Plaintiffs' Conversion, Unjust Enrich-

8. *Melea Ltd. v. Quality Models Ltd.* opinion and order issued July 30, 2003 granting in part and dismissing in part Defendant's Mo-

tion for Dismissal and Summary Judgment No. 03–71338 (E.D.Mich. July 30, 2003).

ment and Patent Infringement Claims. The following motions are now moot: Plaintiff's Motion for Summary Judgment on Counts One (conversion) and Two (unjust enrichment) of the Complaint; and Plaintiffs' Motion for Partial Summary Judgment on (1) Defendant's Affirmative Defenses No. 4 (common law fraud or misrepresentation) and 10 (implied and/or express license); and (2) Count Three of Defendant's Counterclaim (estoppel).

Finally. I GRANT Plaintiff's Motion to Dismiss Count One (tortious interference with advantageous business relations) and Two (unfair competition in violation of 15 U.S.C. § 1125(a)) of Defendant's Counterclaim.

**IT IS SO ORDERED.**